**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | | |
|---|---|---|
| DAVID HENEGAR, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| GEORGIA CORRECTIONAL | ) | |
| HEALTH, LLC, AUGUSTA | ) | |
| UNIVERSITY, AUGUSTA | ) | |
| UNIVERSITY HEALTH, BILL | ) | Case No.  4:18-cv-192-HLM |
| NICHOLS, SHARON LEWIS, CINDY | ) | |
| MCDADE, CHARLES BURKE, | ) | |
| SHERIE L. LEE, NURSE MELTON, | ) | |
| UNKNOWN MEDICAL | ) | |
| PROVIDERS, WARDEN PAMELA | ) | |
| BALLINGER, LIEUTENANT | ) | |
| STROH, SERGEANT KEITH, | ) | |
| UNKNOWN CORRECTIONAL | ) | |
| OFFICERS, CORNERSTONE | ) | **JURY TRIAL DEMANDED** |
| MEDICAL CENTER, CHI | ) | |
| MEMORIAL, JOHN OWENSBY, and | ) | |
| the STATE OF GEORGIA, | | |
| | | |
| *Defendants.* | | |

## COMPLAINT

Plaintiff David Henegar, through his attorneys, complains of defendants

Georgia Correctional Health, Augusta University, Augusta University Health, Bill

Nichols, Sharon Lewis, Cindy McDade, Charles Burke, Sherie L. Lee, Nurse

Melton, Unknown Medical Providers, Pamela Ballinger, Lieutenant Stroh,

1

Sergeant Keith, and Unknown Correctional Officers, Cornerstone Medical Center, CHI Memorial, John Owensby, and the State of Georgia, and states as follows:

## Introduction

1.     David Henegar is afflicted with a very manageable form of epilepsy, a serious medical condition which can be well managed with medication. When properly treated with antiepileptic medication, his condition is controlled. If untreated, however, his epilepsy carries the risk of a grand mal seizure.

2.     While Mr. Henegar was incarcerated at Walker State Prison, Defendants failed to give him his prescribed antiepileptic medication for five days in a row, and as a result he suffered two serious grand mal seizures. Unconscious and with his oxygen intake compromised, he received no medical care for at least 30 minutes after either seizure.

3.     As a result of Defendants' failure to provide Mr. Henegar with any medical care for his epilepsy or seizures, he suffered permanent brain damage, including long-term and short-term memory loss, a loss of vision, and a number of other neurological symptoms. He also suffers from the fear of not knowing whether he will ever regain the memories he lost, or if he will ever recover his faculties, among other distress.

**Jurisdiction and Venue**

4.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

5.      Venue is proper under 28 U.S.C. § 1391(b). On information and belief, one or more Defendants reside in this judicial district, and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

**Parties**

6.      Plaintiff David Henegar was in the custody of the Georgia Department of Corrections at all times during the events giving rise to this complaint. He was housed at Walker State Prison. He now resides in Rock Spring, Georgia.

7.      At all times relevant to its involvement in this case, the State of Georgia operated Walker State Prison through its agency Georgia Department of Corrections ("GDOC"). It is a necessary defendant here for indemnification purposes.

8.      At all times relevant to its involvement in this case, Georgia Correctional Health was the healthcare provider at Walker State Prison. Georgia Correctional Health, pursuant to a contract with the State of Georgia, provides medical services to GDOC. At all times relevant to the events at issue in this case,

3

Georgia Correctional Health was responsible for the implementation, oversight, and supervision of policies and practices at Walker. As an agent of GDOC, Georgia Correctional Health was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the individual medical Defendants and other unknown medical providers at Walker.

9.      Additionally and in the alternative, at all times relevant to this lawsuit, Augusta University employed the Individual Medical Defendants independently and/or in partnership with Georgia Correctional Health. At all times relevant to the events at issue in this case, Augusta University was responsible for implementation, oversight, and supervision of policies and practices at Walker. As an agent of GDOC, Augusta University was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the Individual Medical Defendants and other unknown medical providers at Walker.

10.     Additionally and in the alternative, at all times relevant to this lawsuit, Augusta University Health employed the Individual Medical Defendants independently and/or in partnership with Georgia Correctional Health. At all times relevant to the events at issue in this case, Augusta University Health was responsible for implementation, oversight, and supervision of policies and

4

practices at Walker. As an agent of GDOC, Augusta University Health was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the Individual Medical Defendants and other unknown medical providers at Walker.

11.     At all times relevant to this lawsuit, Defendant Cornerstone Medical was the employer of Defendant Emergency Room Doctor. At all times relevant to the events at issue in this case, Cornerstone Medical Center was responsible for the implementation, oversight, and supervision of policies and practices within its emergency room. Defendant Cornerstone Medical Center was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including Defendant Owensby.

12.     Defendant CHI Memorial purchased Defendant Cornerstone Medical. It is liable for Cornerstone Medical's conduct as its successor.

*Administrator Defendants*

13.     At all times relevant to this lawsuit, Dr. Bill Nichols was the State Medical Director of Georgia Correctional Health. He was employed by Georgia Correctional Health and/or Augusta University and/or Augusta University Health. At all times relevant to the events at issue in this case, Defendant Nichols was responsible for the implementation, oversight, and supervision of policies and

practices at Walker. He is sued here in his individual capacity. As an agent of GDOC, Georgia Correctional Health and/or Augusta University and/or Augusta University Health, Defendant Nichols was at all times relevant to the events at issue in this case acting under color of law and within the scope of his employment.

14.    At all times relevant to this lawsuit, Sharon Lewis was the medical director of Georgia Correctional Health. She was responsible for the implementation, oversight, and supervision of policies and practices at Walker. Defendant McDade is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant McDade was acting under color of law and within the scope of her employment at Georgia Correctional Health and/or Augusta University and/or Augusta University Health.

15.    At all times relevant to this lawsuit, Pamela Ballinger was the warden at Walker State Prison. She was employed by Georgia Department of Corrections. At all times relevant to the events at issue in this case, Defendant Ballinger was responsible for the implementation, oversight, and supervision of policies and practices at Walker. She is sued here in her individual capacity. As an agent of GDOC, Defendant Ballinger was at all times relevant to the events at issue in this case acting under color of law and within the scope of his employment.

*Individual Medical Defendants*

16.  At all times relevant to her involvement in this case, Cindy McDade was the nursing medical supervisor at Walker State Prison. She was responsible for the implementation, oversight, and supervision of policies and practices at Walker. She was employed by Georgia Correctional Health and/or Augusta University and/or Augusta University Health, Defendant McDade is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant McDade was acting under color of law and within the scope of her employment at Georgia Correctional Health and/or Augusta University and/or Augusta University Health.

17.  At all times relevant to this lawsuit, Dr. Burke was the medical supervisor at Walker State Prison. He was responsible for writing inmates' prescriptions and approving medications. He was employed by Georgia Correctional Health and/or Augusta University and/or Augusta University Health. He is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Burke was acting under color of law and within the scope of his employment with Georgia Correctional Health and/or Augusta University and/or Augusta University Health.

18.     At all times relevant to this lawsuit, Sherie L. Lee was a nurse at Walker State Prison. She saw Mr. Henegar after he had his second grand mal seizure on September 1, 2016. She was employed by Georgia Correctional Health and/or Augusta University and/or Augusta University Health. She is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Lee was acting under color of law and within the scope of her employment with Georgia Correctional Health and/or Augusta University and/or Augusta University Health.

19.     At all times relevant to this lawsuit, Nurse Melton was a nurse at Walker State Prison. She saw Mr. Henegar for pill call and was aware that his medication was in short supply. She was employed by Georgia Correctional Health and/or Augusta University and/or Augusta University Health. She is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Melton was acting under color of law and within the scope of her employment with Georgia Correctional Health and/or Augusta University and/or Augusta University Health.

20.     At all times relevant to this lawsuit, Dr. John Owensby was an emergency room doctor at Cornerstone Medical Center. He was the doctor who prescribed the antiepileptic medication to Mr.  Henegar after he had his first grand

mal seizure on or about August 31, 2016. He is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Owensby was acting within the scope of his employment with Cornerstone and/or Augusta University and/or Augusta University Health.

*Individual Correctional Defendants*

21.   At all times relevant to this lawsuit, Lieutenant Stroh was a lieutenant at Walker State Prison. He was the night shift supervisor between August 26, 2016 and September 1, 2016. He was responsible for conducting nighttime pill call at Walker Prison. He is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Stroh was acting under color of law and within the scope of her employment with the GDOC.

22.   At all times relevant to this lawsuit, Sergeant Keith was a sergeant at Walker. He was responsible for conducting nighttime pill call at Walker. He is sued here in his individual capacity. At all times relevant to the events at issue in this case, Sergeant Keith was acting under color of law and within the scope of his employment with the GDOC.

## Allegations

23.   Mr. Henegar has suffered severely because of the Defendants' conduct. Years are missing from his memory of the distant past and his short-term

memory is badly damaged. He has difficulty regulating his emotions of sadness and anger, and he breaks down in tears for no apparent reason.

24.    Mr. Henegar is epileptic. He takes 400 milligrams a day of Dilantin, a drug to control his epilepsy and prevent him from having seizures. He was provided Dilantin at pill call at Walker every day. On or about August 27, 2016, Defendants stopped providing him that medication.

25.    Pill call at Walker Prison takes place three times a day: once in the morning, once in the afternoon, and once in the evening. Medical staff distribute medications at the daytime pill calls, and corrections staff distribute medications at the nighttime pill calls.

26.    The staff members who conduct the pill calls are required to inventory all medication in the pill cart each time they distribute medications. This includes counting all medication in the pill cart, comparing it to the prescription list, and recording the findings. This included all medications, including those that were not distributed at that particular pill call.

27.    Defendant Melton was the medical provider responsible for conducting daytime pill call until August 23, 2016. Defendant Lee conducted daytime pill call between August 26, 2016 and August 31, 2016.

28.     Defendants Stroh and Keith and a third officer conducted evening pill call between August 23, 2016, and August 31, 2016, when Mr. Henegar was scheduled to receive his antiepileptic medication.

29.     On August 23, 2016, Defendant Melton wrote note in Mr. Henegar's chart that that Mr. Henegar took 400 milligrams per day of Dilantin, and that his prescription would be running out in three days. Defendant Melton's note said the prescription had been ordered.

30.     A member of the medical staff also left a post-it note on Mr. Henegar's pill call file on August 25, 2016, stating that his medication would be running out.

31.     When Mr. Henegar got to pill call on August 27, 2016, Defendant Stroh looked at logbook, saw the post-it, and confirmed that there was no medication for Mr. Henegar. Defendant Stroh noted that Mr. Henegar came to pill call and did not receive his medication.

32.     Mr. Henegar nevertheless went to pill call again on August 28, 29, 30, and 31 looking for his medication. Each time the correctional officer in charge of distributing medication told him the medication was not there.

33.     Defendants had access to an emergency supply of Mr. Henegar's antiepileptic medication, but none of the Defendants provided it to Mr. Henegar.

11

34.    Defendant Burke likewise could have authorized medical or corrections staff to give Mr. Henegar Dilantin from another inmate's supply, but he did not.

35.    As warden, Defendant Ballinger was aware of the widespread problems and policies and practices alleged herein, but did nothing to address them.

36.    Just before midnight on August 31, 2016, while he was sleeping in the top bunk in his cell, Mr. Henegar suffered a grand mal seizure. He convulsed violently for about 10 minutes and fell unconscious. Other inmates yelled to get guards' attention and Lieutenant Stroh and Sergeant Keith came to Mr. Henegar's bunk. They called the on-call doctor, Dr. Smith, who told them to call an ambulance.

37.    Paramedics transported Mr. Henegar to the Cornerstone Medical Center emergency room. Mr. Henegar regained consciousness some time during the ambulance ride, and he got to the emergency room about 20 minutes later.

38.    At the emergency room, doctors found the level of Dilantin in Mr. Henegar's system was dangerously low. Although the correct level of Dilantin in Mr. Henegar's blood should have been 15 to 20 micrograms per milliliter, doctors at the Cornerstone found his Dilantin level at 3.2.

12

39.     Defendant Owensby prescribed Mr. Henegar a single 400 mg dose of Dilantin and discharged him, and Mr. Henegar returned to his cell at Walker Prison at around 2:30 a.m.

40.     This was patently insufficient to bring his seizures under control given his low blood levels of Dilantin, and well below the standard of care.

41.     Around 4:30 a.m., back in his bunk, Mr. Henegar had another grand mal seizure. He lost consciousness and his breathing was compromised.  He convulsed violently for three to five minutes. His fellow inmates again yelled out to get guards' attention, and Defendants Stroh and Keith came back to his bunk. They brought him to the medical ward in a wheelchair, and Mr. Henegar was in and out of consciousness for the next 20 or 30 minutes.

42.     They contacted Defendant McDade, who told them not to call ambulance. Defendant McDade instead told Defendants Stroh and Keith that they should take him to the medical department when a nurse arrived in the morning.

43.     When Defendant Lee arrived 30 minutes later, she conducted a medical assessment of Mr. Henegar and found him slow to respond and with dangerously low oxygen levels. His pupillary response time was slow. He was still lapsing in and out of consciousness.

44.     Defendant Lee gave him oxygen and called Defendant Smith, who advised that Mr. Henegar be taken to the emergency room. Defendant Stroh then called for an ambulance.

45.     Mr. Henegar fully regained consciousness in the ambulance.

46.     By the time he got to the Cornerstone emergency room, Mr. Henegar had suffered serious brain damage.

47.     Doctors at the Cornerstone emergency room gave him an intravenous infusion of an antiepileptic drug called Keppra and discharged him. He should have received such a dose of Keppra on his first trip to Cornerstone.

48.     After he returned to Walker, Mr. Henegar filed a grievance about Defendants' failure to provide him Dilantin for five days. The Warden responded to his grievance that the medical director had met with Mr. Henegar to explain the circumstances, and that actions had been taken to ensure that his medication would be administered appropriately.

49.     Mr. Henegar was released from GDOC on or around July 31, 2018.

50.     Mr. Henegar's injuries could easily have been prevented had Defendants merely provided him his prescribed medication—medication they knew he needed, knew of the risks he faced if he did not get, and knew they were running out of. But instead of merely refilling Mr. Henegar's prescription, or

14

giving him medication from the prison's emergency supply, Defendants did nothing.

51.     As a direct result of Defendants' complete failure to provide him with any medical care, Mr. Henegar has suffered severe neurological damage and severe emotional distress, including memory loss and emotional dysregulation.

52.     Prior to his seizures on August 31 and September 1, 2016, Mr. Henegar was jovial and always well-liked. But his difficulty regulating his emotions has caused him to withdraw. He no longer wants to talk to people or be in groups, fearing that he will explode with anger or tears.

53.     Mr. Henegar also now experienced decreased vision in his right eye, headaches, and periodic disorientation, numbness, nausea, dizziness, and arm pain.

54.     Following Mr. Henegar's tragic and perfectly preventable medical emergency, Defendant Ballinger offered to fire Defendant McDade.

55.     Unfortunately, Mr. Henegar is not the only inmate to suffer unconstitutional medical care while in a Georgia state prison. Defendant Georgia Correctional Health has been aware of, and responsible for, numerous instances in recent years in which inmates have received unconstitutionally inadequate medical care. For example, Georgia Correctional Health doctors recently failed to provide medical treatment to an inmate who had a small cut on his leg, and as result the cut

became infected and the inmate had to have his leg amputated. Another GDOC inmate died in 2015 after a tattoo became infected and, despite requesting antibiotics from Georgia Correctional Health doctors, he received no treatment. These and other instances of constitutionally inadequate care point to serious flaws in the Georgia Correctional Health system which Defendant Ballinger and others were responsible to address.

### COUNT 1
### 42 U.S.C. § 1983—Eighth Amendment—Denial of Medical Care
### Defendants Ballinger, Nichols, Lewis, McDade, Burke, Lee, Melton, Stroh, Keith, Georgia Correctional Health, Augusta University, and Augusta University Health

56.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

57.    As described more fully above, Defendants had notice of Mr. Henegar's medical needs and the seriousness of his medical needs, and knew the risk of harm to Mr. Henegar if he did not receive his medication. Despite that knowledge, Defendants failed to provide him any proper medical care or access to medical care, in violation of the Eighth Amendment of the United States Constitution.

58.   As a result of Defendants' unjustified and unconstitutional conduct, Mr. Henegar experienced pain, suffering, emotional distress, brain damage, memory loss, and injury.

59.   Defendants were deliberately indifferent to Mr. Henegar's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or with reckless indifference to Mr. Henegar's rights.

60.   Mr. Henegar's injuries were proximately caused by policies and practices of Defendants Georgia Correctional Health and/or Augusta University and/or Augusta University Health.

61.   At all times relevant to the events at issue in this case, Defendant Georgia Correctional Health contracted with GDOC to provide medical care to men housed at Walker State Prison, including Mr. Henegar. As the provider of healthcare services to prisoners incarcerated at Walker and other GDOC facilities, Georgia Correctional Health was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in GDOC custody.

62.   In the alternative, at all times relevant to the events at issue in this case, Defendant Augusta University and/or Augusta University Health contracted with GDOC to provide medical care to men housed at Walker State Prison,

17

including Mr. Henegar. As the provider of healthcare services to prisoners incarcerated at Walker and other GDOC facilities, Defendant Augusta University and/or Augusta University Health was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in GDOC custody.

63.    Prior to the events giving rise to this Complaint, Defendants Georgia Correctional Health and/or Augusta University and/or Augusta University Health had notice of policies and widespread practices by medical and correctional staff at Walker pursuant to which prisoners like Mr. Henegar with serious medical needs were routinely denied medication. Specifically, there existed policies or widespread practices at Walker under which prisoners receive medical care so inadequate that it violates the Eighth Amendment of the United States Constitution, including policies and practices pursuant to which: (1) medical and correctional staff fail to obtain or dispense medications for prisoners; (2) medical and correctional staff fail to respond or respond inadequately to prisoners who report issues with their medications, including not receiving those medications; (3) failure to implement a policy regarding prisoners' prompt access to medical care in emergency medical situations; (4) failure to implement a proper policy regarding calling an ambulance in emergency medical situations; and (5) failure to

implement a proper policy regarding send prisoners to outside providers to receive medical care.

64.    In addition, Defendants Georgia Correctional Health and/or Augusta University and/or Augusta University Health were aware of gaps in policies or implementation of policies at Walker that caused prisoners at the facility to receive unconstitutionally inadequate medical care, including: (1) a failure to implement a policy regarding prisoners' access to medication; (2) a failure to implement a policy regarding prisoners' medication refills; (3) failure to implement a policy regarding prisoners' prompt access to medical care in emergency medical situations; (4) failure to implement a proper policy regarding calling an ambulance in emergency medical situations; and (5) failure to implement a proper policy regarding send prisoners to outside providers to receive medical care.

65.    These policies and widespread practices were allowed to flourish because Defendants Georgia Correctional Health and/or Augusta University and/or Augusta University Health, which direct the provision of healthcare services at Walker, directly encouraged the very type of misconduct at issue in this case and failed to provide adequate training and supervision of medical and correctional staff. Defendants Georgia Correctional Health and/or Augusta University and/or Augusta University Health violated Mr. Henegar's rights by maintaining policies

19

and practices that were the moving force driving the foregoing constitutional violations.

66.     The above-described policies and widespread practices, so well-settled as to constitute de facto policy at Walker, were able to exist and thrive because Defendant Georgia Correctional Health and/or Augusta University and/or Augusta University Health were deliberately indifferent to the problem, thereby effectively ratifying it.

67.     At all times relevant to their involvement in this case, Defendants Nichols, Lewis, Burke, and McDade were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding medical care at Walker, the training of correctional and medical staff at Walker on providing medical care to prisoners, and providing prisoners access to medical care; and the supervision of correctional and medical employees who provided medical care and were responsible for providing prisoners access to medical care.

68.     Prior to the events giving rise to Plaintiff's Complaint, Defendants Ballinger, Nichols, Lewis, Burke, and McDade had notice of policies and widespread practices by medical and correctional staff at Walker pursuant to which prisoners like Mr. Henegar with serious medical needs were routinely denied

medical care and access to medical care. Specifically, there existed policies or widespread practices at Walker pursuant to which prisoners receive unconstitutionally inadequate medical care, including policies and practices pursuant to which: (1) medical and correctional staff fail to obtain or dispense medications for prisoners; (2) medical and correctional staff fail to respond or respond inadequately to prisoners who report issues with their medications, including not receiving those medications; (3) medical and correctional staff fail to provide timely healthcare to prisoners; (4) medical and correctional staff delay calling an ambulance in emergency medical situations; and (5) medical and correctional staff fail to send prisoners to outside providers to receive medical care.

69.    In addition, Defendants Ballinger, Nichols, Lewis, Burke, and McDade were aware of gaps in policies at Walker that caused prisoners at the facility to receive unconstitutionally inadequate medical care, including: (1) a failure to implement a policy regarding prisoners' access to medication; (2) a failure to implement a policy regarding prisoners' medication refills; (3) medical and correctional staff fail to provide timely healthcare to prisoners; (4) medical and correctional staff delay calling an ambulance in emergency medical situations; and (5) medical and correctional staff fail to send prisoners to outside providers to receive medical care.

21

70.     These policies and widespread practices were allowed to flourish because Defendants Nichols, Lewis, Burke, and McDade, who oversaw the provision of healthcare to prisoners at Walker and were responsible for ensuring that prisoners have access to medical care, directly encouraged the very type of misconduct at issue in this case, and failed to provide adequate training and supervision of medical and correctional staff. Defendants Nichols, Lewis, Burke, and McDade violated Mr. Henegar's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

71.     Defendant Ballinger was aware of these deficiencies, and was aware that these deficiencies threatened Mr. Henegar and others with serious medical conditions, but did nothing to remedy them.

72.     The above-described policies and widespread practices, so well settled as to constitute de facto policy at Graham, were able to exist and thrive because Defendants Nichols, Lewis, Burke, and McDade were deliberately indifferent to the problem, thereby effectively ratifying it.

73.     Mr. Henegar's injuries were caused by employees of GDOC and Georgia Correctional Health, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described in this Count.

22

**COUNT II**
**42 U.S.C. § 1983—Conspiracy**
**Defendants Ballinger, Nichols, Lewis, McDade, Burke, Lee, Melton, Stroh,**
**Keith, Georgia Correctional Health, Augusta University, and Augusta**
**University Health**

74.     Plaintiff incorporates each paragraph of this Complaint as if fully

restated here.

75.     Defendants reached an agreement among themselves to deprive Mr.

Henegar of his constitutional rights and to protect one another from liability for

depriving Mr. Henegar of his rights, all as described in the various paragraphs of this

Complaint.

76.     In furtherance of the conspiracy, each of the coconspirators committed

overt acts and was an otherwise willful participant in joint activity.

77.     The misconduct described in this Count was undertaken intentionally,

with malice, and/or with reckless indifference to Mr. Henegar's rights.

78.     As a direct and proximate result of the illicit prior agreement referenced

above, Mr. Henegar's rights were violated and he suffered injuries, including pain,

suffering, emotional distress, and memory loss.

79.     Defendant Ballinger was aware of this conspiracy and did nothing to

stop it.

80.     Mr. Henegar's injuries were caused by employees of the GDOC and

Georgia Correctional Health and/or Augusta University and/or Augusta University Health, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

**COUNT III**
**42 U.S.C. § 1983—Eighth Amendment—Failure to Intervene**
**Defendants Ballinger, Nichols, Lewis, McDade, Burke, Lee, Melton, Stroh, Keith, Georgia Correctional Health, Augusta University, and Augusta University Health**

81.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

82.     As described more fully above, Defendants had a reasonable opportunity to prevent the violation of Mr. Henegar's constitutional rights as set forth above had they been so inclined, but failed to do so.

83.     Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Mr. Henegar's rights.

84.     As a direct and proximate result of Defendants' misconduct, Mr. Henegar's rights were violated and he suffered injuries, including pain, suffering, emotional distress, and loss of vision.

85.     Mr. Henegar's injuries were caused by employees of the GDOC and Georgia Correctional Health and/or Augusta University, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices

described more fully above.

## COUNT IV
## Medical Malpractice
## Defendants McDade, Lee, Melton, Burke, Georgia Correctional Health, Augusta University, Augusta University Health, Cornerstone Medical Center, and CHI Memorial

86.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

87.     At all times relevant to the events discussed in this complaint, Defendants McDade, Lee, Melton, Burke, Georgia Correctional Health and/or Augusta University and/or Augusta University Health had an affirmative duty to provide Mr. Henegar with appropriate medical care and treatment in a manner consistent with the prevailing standards of care.

88.     At all times relevant herein, Defendants McDade, Lee, Melton, Burke, Georgia Correctional Health and/or Augusta University and/or Augusta University Health, Cornerstone Medical Center, and CHI Memorial held themselves out, either in their individual capacity or by and through their various agents, servants and/or employees, as possessing the requisite ability, skill, and expertise for providing competent medical care and treatment in accordance with applicable and prevailing standards of care.

89.     At all times relevant herein Defendants McDade, Lee, Melton, Burke

were acting as the agents, servants, and/or employees of Georgia Correctional

Health and/or Augusta University and/or Augusta University Health within the

scope of their employment. Georgia Correctional Health and/or Augusta University

and/or Augusta University Health had the power to control the activities of each of

the Defendants mentioned herein.

90.     At all times relevant herein, Defendant Owensby was acting as the

agent, servant, and/or employee of Cornerstone Medical Center and/or Augusta

University and/or Augusta University Health within the scope of his employment.

Cornerstone Medical Center and/or Augusta University and/or Augusta University

Health had the power to control the activities of the Defendant mentioned herein.

91.     At all times relevant herein, Defendants McDade, Lee, Melton, Burke,

and Owensby were aware of the prevailing standard of care for individuals with

epilepsy, and yet, each of the Defendants herein breached that standard of care by

failing to give Mr. Henegar his medication or provide timely emergency care during

or after his grand mal seizures.

92.     Mr. Henegar suffered severe pain, distress, and bodily injury as a

result of Defendants' failures to provide preventative or emergency care.

93.     Had Defendants McDade, Lee, Melton, or Burke properly provided

Mr. Henegar with his antiepileptic medication and immediately taken him to an

emergency care provider after his seizures, he could have been appropriately treated and any damages he may have suffered would have been minimized.

94.     Had Defendant Owensby properly provided Mr. Henegar with an appropriate dose of antiepileptic medication the first time he went to the emergency room on August 31, 2016, any damages he may have suffered from the second seizure would have been minimized.

95.     As a direct and proximate result of the Defendants McDade, Lee, Melton, Burke, Georgia Correctional Health and/or Augusta University and/or Augusta University Health, Owensby, Cornerstone Medical Center, and CHI Memorial's breach of the standards of care herein, Mr. Henegar sustained tremendous pain, injury, anguish, and suffering, entitling him to compensatory damages.

96.     Mr. Henegar in no way contributed, neither directly nor indirectly, to any of his damages through a lack of due care or negligence.

**COUNT V**
**Respondeat Superior**
**Georgia Correctional Health and/or Augusta University and/or Augusta University Health**

97.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

98.   In committing the acts alleged in the preceding paragraphs, Defendants Nichols, McDade, Lee, Melton, Burke, and Lewis were employees, members, and agents of Georgia Correctional Health, acting at all times within the scope of their employment.

99.   Consequently, Defendant Georgia Correctional Health and/or Augusta University and/or Augusta University Health are liable for the actions of its employees acting within the scope of their employment under state law.

**COUNT VI**
**Indemnification**
**State of Georgia**

100.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

101.   Georgia law provides that the commissioner of administrative services can buy insurance to pay any tort judgment for compensatory damages for which public employees are liable within the scope of their employment.

28

102.    Defendants Ballinger, Stroh, and Keith are or were employees of the Georgia Department of Corrections and acted within the scope of their employment in committing the misconduct described above.

103.    Defendants Nichols, Lewis, and the Individual Medical Defendants are or were employees of Augusta University, and acted within the scope of her employment in committing the misconduct described above.

104.    The State of Georgia is obligated to pay any judgment entered against individual Defendants within the scope of their employment for GDOC or Augusta University.

## JURY DEMAND

Plaintiff David Henegar hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.


Dated: August 27, 2018

                                        Respectfully submitted,

                                        /s/ Zack Greenamyre
                                        Zack Greenamyre
                                        Georgia Bar No. 293002
                                        *Attorney for Plaintiff*

Mitchell & Shapiro LLP
3490 Piedmont Road, Suite 650
Atlanta, GA 30305

404-812-4751
zack@mitchellshapiro.com

Arthur Loevy
Mike Kanovitz
/s/ Rachel Brady[1]
Illinois Bar No. 6312402

Loevy & Loevy
311 N. Aberdeen Street, Third Floor
Chicago, IL 60607
312-243-5900
brady@loevy.com

---

[1] Motion for admission *pro hac vice* forthcoming.