# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ROME DIVISION

DAVID HENEGAR,           )
                                )
       *Plaintiff,*      )
                                )  Case No. 4:18-cv-00192-HLM
       *v.*              )
                                )
GEORGIA CORRECTIONAL   )
HEALTH, LLC, et al.,        )  JURY TRIAL DEMANDED
                                )
       *Defendants.*   )
                                )

## PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, David Henegar, through his attorneys, responds in opposition to motions for summary judgment filed by Defendants Stroh and Keith ("Officer Defendants"), and Melton, Lee, Harrell, and McDade ("Medical Defendants"), stating as follows:

## INTRODUCTION

David Henegar suffers from permanent brain damage and an uncontrollable seizure disorder as a result of two tragically preventable seizures he experienced at Walker State Prison in 2016. Before the events at issue in this case, his seizure disorder had been perfectly controllable by taking his daily medication, and he was able to live a normal life despite this medical condition.

That changed in August of 2016, when the defendants in this case needlessly deprived him of this medication for four consecutive days, all the while knowing of the serious risks to his health. As to each Defendant, there is ample evidence that he or she knew Mr. Henegar was going day after day without his medication.

The ensuing seizures were an easily foreseeable result of leaving him unmedicated. The first seizure hit very hard; Mr. Henegar convulsed for so long that he incurred permanent brain damage and required a trip to the hospital. The hospital provided him some medication and sent him back to

the prison, but he still suffered a second seizure. The indifference continued, as he was allowed to languish in a dangerously depressed respiratory state for over 30 minutes without any medical care at all.

This is not a case that can be resolved at summary judgment. Defendants acknowledge that they did not give Mr. Henegar any seizure medicine during the days leading up to his seizures, and also that he received no medical attention for over 30 minutes after his second seizure. Defendants argue only that they acted appropriately or lacked notice, and Mr. Henegar presents ample evidence at summary judgment for a jury to find each defendant was aware of a serious risk of harm to Mr. Henegar but failed to take reasonable steps to address it. Accordingly, the Court should deny Defendants' motions.

## FACTUAL BACKGROUND

### *David Henegar*

David Henegar is a trained welder and mechanic. P's SOF ¶1.[1] For years leading up this lawsuit, he had been consistently employed in trade positions, including holding jobs as a welder, truck mechanic, and machinist.

---

[1] "P's SOF" refers to Plaintiff's Statement of Additional Material Facts. "Ds' SOF" refers to Defendant Stroh, Keith, Lee, Harrell, and Melton's Statement of Material Facts. "M's SOF" refers to Defendant McDade's Statement of Material Facts.

*Id.* ¶2. While detained in the faith-and-character program at Walker State Prison before the denial of medical care in this case, he shared his skills with others, teaching friends how to weld. *Id.* ¶4, 5. He also tried to be positive and keep everyone in the prison in good spirits. *Id.* ¶4.

As stated, until the events at issue in this lawsuit, Mr. Henegar's seizure disorder was well-managed. P's SOF ¶99. He had been on a consistent regimen of seizure medication since his diagnosis with a seizure disorder in 2015, and had not had a single seizure since starting prescribed medication. *Id.* ¶99. Defendants were aware of the seizure disorder and the prescription, and for a time they followed the doctor's prescribed treatment. *Id.* ¶¶3-5; M's SOF ¶29. But in August 2016, they stopped. M's SOF ¶¶12-13. Mr. Henegar went four days without the medicine, during which Defendants took no steps to find him any. M's SOF ¶¶12, 13. On the fourth day, he started seizing due to the lack of medication, suffering back-to-back seizures on August 31 and September 1, 2016. P's SOF ¶¶61, 66, 82.

Those seizures caused brain damage from which Mr. Henegar will never recover. P's SOF ¶88, 101. He now has a permanent short-term memory impairment and difficulty regulating his emotions, including fits of anger and sadness. *Id.* ¶¶88-89. Mr. Henegar also can no longer control his seizure disorder, even with medication. *Id.* ¶100. These impairments have

changed his life forever. They make it difficult to hold down a job, as he cannot retain instructions and forgets tasks, and because he could have a seizure at any time, even with medication. *Id.* ¶¶92, 100. They also have ruined many of his relationships and ability to socialize. He went from a bright person, considered friendly and positive, to being called "Negative Dave"—negative, withdrawn from social interactions, and humiliated by his inability to remember people he's just met. *Id.* ¶¶90-91, 98.

Mr. Henegar is also impaired from managing his own affairs. Due to his memory loss and uncontrollable seizures, he cannot live on his own or independently perform many of the usual tasks of daily life, like grocery shopping and bill paying. *Id.* ¶¶93, 95, 96, 97. He must keep a journal to record every event and appointment; without it, he forgets what has happened in his life. *Id.* ¶94. And even though he takes medication daily, there is a constant risk that he will suffer a life-threatening seizure. *Id.* ¶100.

These seizures were entirely preventable. P's SOF ¶¶83-85, 87-88. Defendants knew Mr. Henegar's regular prescription supply of Dilantin had run out, and even had doses of Dilantin available in another part of the prison, but Defendants could not be bothered to obtain it for him. *Id.* ¶¶53, 56. If they had, these seizures would not have occurred. *Id.* ¶¶83-85, 87-88.

4

***Despite a Readily Available Supply of Dilantin, Defendants Stopped
Giving Mr. Henegar Dilantin, Which Caused a Seizure after Four Days***

As for the events giving rise to this lawsuit, the parties largely agree on
what happened. The most salient disputes arise from Defendants' attempts to
point fingers at each other, generating conflicting accounts about who told
whom about the lack of medication and who was expected to do something
about it. These conflicting accounts underscore that a jury must hear this
case and summary judgment must be denied.

The following facts are undisputed: Mr. Henegar went to his assigned
9:00 p.m. pill call on August 28, where he saw Defendants Stroh and Keith.
Ds' SOF ¶¶11, 12, 15-17; M's SOF ¶13; Resp. to Ds' SOF ¶17. Mr. Henegar's
Dilantin was not on the pill cart. M's SOF ¶¶12, 13. Keith made an
unidentifiable marking in Henegar's medication administration record
("MAR") to record that Mr. Henegar had come to pill call but not received his
medication, and sent Mr. Henegar on his way. P's SOF ¶52.

Mr. Henegar went to his assigned pill call on August 29 and 30, but his
Dilantin still was not there. M's SOF ¶13. The corrections officer conducting
pill call wrote a "question mark" in Mr. Henegar's MAR for those two days,
which signified there was a problem with his medication. P's SOF ¶¶43, 52.

When Mr. Henegar went to pill call on August 31 (which was conducted by Defendants Stroh and Keith), Keith wrote a third consecutive question mark in the MAR and, without knowing whether Dilantin was available elsewhere in the prison, told Mr. Henegar to go to the sick bay in the morning. Resp. to Ds' SOF ¶98. Both officers knew that Mr. Henegar was on his fourth day without Dilantin, that jotting a question mark in the MAR not result in Mr. Henegar receiving Dilantin, that a lack of Dilantin could cause serious medical problems, P's SOF ¶54, and that they could call the on-call nurse if there was a medical need, *Id.* ¶8, yet they did nothing.

At some point during those three days, Mr. Henegar also attended a daytime pill call in an attempt to get Dilantin, but it was not provided to him. P's SOF ¶59. During this time there was also a post-it note sticking out like a flag from Mr. Henegar's file in the pill cart, signaling to anyone who looked in the pill cart that there was a problem with his medication. P's SOF ¶48-50. The string of question marks in the MAR also signaled to anyone who saw it that there was a problem with his Dilantin. *Id.* ¶¶42-43.

Walker Prison had a readily available supply of Dilantin in its standard ward inventory ("SWI") that any medical provider could access, but no one provided a dose from the SWI to Mr. Henegar. Ds' SOF ¶¶74, 75. Walker staff could also get medication within hours from either a local

pharmacy or the Georgia Department of Corrections ("GDC") pharmacy. P's SOF ¶60. No one got any for him.

Meanwhile, Defendants Lee, Harrell, and McDade were working daytimes in Medical. Ds' SOF ¶¶22, 27; P's SOF ¶58. Walker's other nurse, Maryann Melton, had gone on medical leave. Ds' SOF ¶24. While the nursing department shared a mission to ensure that inmates received their prescriptions, Defendant McDade, the nursing supervisor, let her subordinates implement their own processes for ensuring this mission was carried out. P's SOF ¶24; M's SOF ¶1. Duties performed in the medical department included ordering medications and checking them off in a binder ("the Binder") when they were delivered, inventorying the pill cart, and conducting daytime pill call. P's SOF ¶¶30-32, 34; Resp. to Ds' SOF ¶54. Any Medical Defendant who looked at the Binder or the pill cart would have known there was a problem with Mr. Henegar's Dilantin. P's SOF ¶¶33, 35, 47-49.

The evidence supports two inferences on this point. One: Medical Defendants knew they were supposed to be checking the MAR, pill cart, and Binder every day and did not because McDade did not enact appropriate policies. Or two: they did do those tasks, in which case they necessarily saw

that Mr. Henegar's Dilantin was missing, yet took no steps to get

Mr. Henegar Dilantin before his seizures.

Beyond that, Defendants dispute between themselves who told whom about the medication, who was supposed to do something about it, and which defendants knew what. For instance, Keith says that before his shift ended on August 29, he told the only nurse who was at Walker that Henegar's medication was missing. Ds' SOF ¶101. Defendant Lee, the only nurse on duty during Keith's August 29 shift, denies that Keith said anything about it. Ds' SOF ¶127. Nurse Melton says that someone from nursing should have checked the MARs every day, P's SOF ¶45, while McDade says it was supposed to happen only weekly, *Id.* ¶19. Ultimately a jury will have to determine which version of the facts to believe based on their observations of the various witnesses in court and make credibility determinations. At this stage, with the defendants pointing the finger at each other, this Court cannot grant summary judgment for any of them.

### Mr. Henegar's First Seizure

By 10:50 p.m. on August 31, Mr. Henegar had begun suffering a massive seizure, called status epilepticus. P's SOF ¶86; Ds' SOF ¶104. He actively convulsed for nearly 20 minutes. P's SOF ¶61. His eyes were rolled back in his head and he was foaming at the mouth. *Id.* ¶62. He was

convulsing so violently that the entire bed was shaking. *Id.* This seizure, which was disturbing to those who witnessed it, was so prolonged and severe that it caused permanent brain damage. *Id.* ¶¶62, 86-87, 100.

Taking the facts in Plaintiff's favor, Defendant Stroh called Defendant McDade after learning about the seizure, and she told him to call 911. Ds' SOF ¶107-108. Paramedics transported Mr. Henegar to the emergency room. *Id.* ¶110. When Mr. Henegar returned to Walker about three hours later, Stroh called McDade again and told her that Mr. Henegar's Dilantin supply had run out. P's SOF ¶63. Defendant McDade acknowledged that she had already known this, telling him that it was "on order." *Id.* ¶64.

### *Mr. Henegar's Second Seizure*

A few hours later, Mr. Henegar suffered another seizure. Ds' SOF ¶112. According to the contemporaneous incident report, Mr. Henegar seized for three to five minutes. P's SOF ¶72. Keith arrived at Mr. Henegar's bunk, *id.* ¶66, and Stroh went straight to the office to call McDade; he did not observe Mr. Henegar, *id.* ¶67. He told McDade that Henegar was having a seizure but that he had not seen him. *Id.* ¶¶66-70. Stroh also testified that the only other thing he may have told McDade, based on what Keith communicated to him, was that Mr. Henegar was not actively seizing. *Id.* ¶71. He did not provide any information about Mr. Henegar's appearance or vital signs. *Id.* ¶76.

Even though McDade knew Stroh could not see Mr. Henegar or report his vitals, and seizures can have life-threatening consequences, and despite that it is standard practice in the corrections setting to call for an ambulance immediately after a patient has a seizure, McDade told Stroh not to call 911. P's SOF ¶¶68, 70-71, 73, 75-78; Ds' SOF ¶115. She told him instead to let Mr. Henegar sit, in and out of consciousness, for over 30 minutes until the first nurse arrived at work later that day. P's SOF ¶¶72, 79; Ds' SOF ¶115. Medical care finally arrived at Mr. Henegar's bunk at 37 minutes after security was alerted about his seizure. P's SOF ¶79; Ds' SOF ¶112. When she arrived, Nurse Lee determined that Mr. Henegar's blood oxygen level was still dangerously low even 37 minutes after his seizure. P's SOF ¶81. Beyond the trauma of his two seizures, Mr. Henegar suffered in respiratory distress without any medical care throughout that time. *Id.* ¶80.

## LEGAL STANDARD

"Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's prohibition against unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail at summary judgment on a claim of deliberate indifference, a plaintiff must demonstrate that a genuine dispute exists whether he suffered from an objectively serious medical need, and that one or more defendants acted with

10

deliberate indifference, causing the plaintiff's injuries. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). The Eleventh Circuit has refined this test further, requiring a plaintiff to show a dispute about whether the defendants were subjectively aware of the medical need and disregarded the risk by conduct that is "more than mere negligence." *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016). A plaintiff does not need to prove that the prison official "acted or failed to act believing that a harm actually would befall" the prisoner. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

Deliberately indifferent conduct comes in many forms, including "grossly inadequate care"; "a decision to take an easier but less efficacious course of treatment"; and "medical care that is so cursory as to amount to no treatment at all." *Id.* at 1223. It can include refusing to provide readily available treatment or failing to inform competent authorities of a need for medical care. *See Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989) (prison official "took no action" and failed to "inform competent authorities …of a prisoner's need for… psychiatric care" was deliberately indifferent); *Harris v. Coweta Cty.,* 21 F.3d 388, 393 (11th Cir. 1994) ("A complete denial of readily available treatment for serious medical condition is deliberate indifference.")

There is also a tome of case law from this Circuit and around the country clearly spelling out that failing to provide an inmate with prescribed seizure medication is deliberate indifference. *See, e.g., Sparks v. Ingle*, 724 F. App'x 692, 694 (11th Cir. 2018) (jail administrator was deliberately indifferent when he failed to provide seizure medication to an inmate despite knowing the inmate had seizures); *Parsons v. Caruso*, 491 F. App'x 597, 605-06 (6th Cir. 2012) (reversing grant of summary judgment to prison employees because their knowing failure to provide Dilantin was deliberate indifference); *Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006) ("knowing failure to administer prescribed [seizure] medicine can itself constitute deliberate indifference"); *Fox ex rel. Fox v. Peters*, 2011 WL 6378826, at *6 (N.D. Ill. Dec. 19, 2011) (inmate's comment to defendant that "I take Dilantin" should have caused defendant to investigate).

Defendants rightly do not dispute that Mr. Henegar had an objectively serious medical condition that required medication, that a seizure is objectively serious, or that failure to provide seizure patients with mediation is a serious risk. Nor do they dispute that the four-day deprivation of Dilantin caused Mr. Henegar's seizures. Rather, the only issue this Court must evaluate is whether, as to each Defendant, a jury could find he or she was aware of Mr. Henegar's serious medical need and whether their response

to that awareness would permit a reasonable jury to conclude they were deliberately indifferent.

At summary judgment, Defendants bear the "exacting burden" of demonstrating that there are no disputes about any material fact in the case. *Jones v. Evans*, 544 F. Supp. 769, 773 (N.D. Ga. 1982). This court must deny summary judgment if it finds that there are disputes of material fact. FED. R. CIV. P. 56(a); *Melton*, 841 F.3d at 1220. This Court may grant summary judgment for Defendants only if, after taking the evidence and drawing all inferences Mr. Henegar's favor, no reasonable jury could find that Defendants were deliberately indifferent. *Jones*, 544 F. Supp. at 773.

## ARGUMENT

## I.   Fact Issues Preclude Summary Judgment for Officer Defendants

There is sufficient evidence for a reasonable jury to conclude that Officer Defendants were deliberately indifferent by knowingly failing for four days to ensure Mr. Henegar got his Dilantin. The Officer Defendants acknowledge that they knew Mr. Henegar was not getting his medication and therefore had a serious medical need, Ds' SOF ¶¶11-12, 92, 98, but contend there can be no dispute that they acted reasonably to address this need merely by putting a question mark in Mr. Henegar's MAR, without taking a

single additional action to address the problem, such as sending an email or contacting the on-call nurse.

Officer Defendants are incorrect for two reasons. First, a reasonable jury could find that making a question mark on the MAR was contrary to their training or tantamount to doing nothing at all. Second, and relatedly, even if the jury believes that Officer Defendants were told to make the question mark (and/or if the jury credits Keith's story that he told a nurse on the 29th), both knew by August 31 that Mr. Henegar had gone four days without medication, and therefore whatever they were doing to notify medical staff was not working. They knew Mr. Henegar was in grave danger and a jury could conclude that at some point they had to do more. Any of these factual paths permit a jury to find them deliberately indifferent.

While the Officer Defendants have no duty to make medical judgments themselves, they do have a duty to alert medical staff about a medical problem so that the medical staff can assess it and make medical judgments. *Patel v. Lanier Cty. Ga.*, 969 F.3d 1173, 1190 (11th Cir. 2020) (officer was deliberately indifferent by failing "to enlist the help of a medical professional in the face of a serious medical need"); *Waldrop*, 871 F.2d at 1036 ("failure to notify competent officials" about a serious medical need can constitute deliberate indifference). In particular here, having been made aware of Mr.

14

Henegar's need for seizure medication and the fact that he was not receiving it, Defendants were at a minimum required to ensure that the medical staff actually learned that Mr. Henegar was not receiving the medication that had been prescribed for him each day. *See Patel*, 969 F.3d at 1190; *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006).

> **A.   A reasonable jury could conclude that writing "?" and doing nothing more was deliberately indifferent**

To the first scenario, a jury could reasonably conclude that Officer Defendants' act of writing question marks, without more, was deliberately indifferent because they either ignored their training or failed to act reasonably under the circumstances. McDade testified that she had trained the Officer Defendants to call the prison nurse or on-call doctor if a problem arose with an inmate's medication. P's SOF ¶7. A jury could believe McDade's testimony, in which case Stroh did not abide this training, P's SOF ¶56, and a reasonable jury could find him deliberately indifferent for failing to notify someone when they knew they needed to. *Dang v. Sheriff, Seminole Cty.*, 856 F.3d 842, 850 (11th Cir. 2017) ("An official disregards a serious risk by more than mere negligence when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment….").

The evidence also justifies a reasonable inference that Defendant Keith ignored this training as well. Although Keith, unlike Stroh, at least claims to have told a nurse that Mr. Henegar had not received his medication, other evidence contradicts this contention. Keith does not remember who the supposed nurse was or when he told her, but there was only one nurse at Walker at the same time as Keith between August 28 and August 31—Nurse Lee—and they overlapped only once, on Monday, August 29 in the morning. P's SOF ¶58. Nurse Lee testified that she did not know Mr. Henegar was missing any doses of Dilantin. Ds' SOF ¶127. A jury is entitled to believe her and infer that Keith did not notify a nurse about Mr. Henegar's medical problem, in which case he would be deliberately indifferent for the same reasons as Stroh.

Even further, evidence about McDade's training is not necessary to establish Officer Defendants' deliberate indifference at summary judgment. Officer Defendants failed to take reasonable steps in response to a known medical need—in this case, communicating to medical staff that Mr. Henegar wasn't getting his Dilantin—and thus a jury could find deliberate indifference. *See Sims v. City of Atlanta*, No. 1:17-CV-00519-RWS, 2018 WL 10396436, at *7 (N.D. Ga. Mar. 19, 2018) (nonmedical "'prison official will generally be justified in believing that the prisoner is in capable hands'…'but

at the same time, they cannot wil[l]fully ignore a clear threat to a prisoner's well-being'" (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004), and *Valderrama v. Rousseau*, 780 F.3d 1108, 1122 (11th Cir. 2015)). A jury is entitled to assess the reasonableness of Officer Defendants' chosen method of communication in light of the available options, like calling the nurse or sending an email. *See Farmer v. Brennan*, 511 U.S. 825, 857 (1994) ("Where a prisoner can prove that no such reasonable steps were taken [to ensure his safety] the Eighth Amendment is violated ….").

Though Officer Defendants claim they thought they needed to do nothing more than make a question mark in the MAR in a situation like this, a jury does not have find this response reasonable in light of the evidence that it was not. Stroh and Keith themselves acknowledged their affirmative duty to alert medical when they learn about a medical problem, and when there is a discrepancy between an inmate's prescription and the medication available on the pill cart. P's SOF ¶8; Resp. to Ds' SOF ¶60. This resonates with Walker's policy that they must contact an on-call provider directly in emergent medical situations, P's SOF ¶6, and makes sense given that it is common knowledge among correctional officers that they must notify nursing staff directly about a medical issue, *id*. ¶10.

Oddly, however, Officer Defendants assert that the only thing they needed to do to discharge their duty in Mr. Henegar's situation was to write a question mark in Mr. Henegar's MAR for each day he came to pill call and his medication was not there.[2] Ds' SOF ¶¶69, 71. In light of their own professed understanding of Walker's policy, P's SOF ¶¶6, 8, common corrections practice, *id.* ¶10, Plaintiff's expert evidence that this meager act was not reasonable, *id.* ¶¶ 9, 11, and the ease with which they could have directly notified medical about the missing medication, *id.* ¶8, a jury could find their failure to do something more deliberately indifferent.

### B. A reasonable jury could conclude that by Day Four without Dilantin, Stroh and Keith had to do more

There can be no dispute that by Day Four without Dilantin, Officer Defendants' response was wholly inadequate and therefore deliberately indifferent. Officer Defendants knew on August 31 that medical staff had not received notice and that the medical problem continued unabated. A jury could find that their failure to do something else by the fourth day, such as

---

[2] Keith attempts to justify this by saying that a "discrepancy" occurs only when the medication listed in the inmate's chart is *different* from the medication on the pill cart, and not if the medication is simply missing. This *post hoc* explanation is truly incredible, as the problem is the same either way: the medication listed in the chart is not there. Calling medical in one instance but not the other is deliberately indifferent.

calling the on-call doctor, was far greater than "mere negligence." *Melton*, 841 F.3d at 1223—it was a knowing and conscious disregard for Mr. Henegar's health and safety.

Corrections officers have a duty to take reasonable measures to obtain medical help under the circumstances, *Farmer*, 511 U.S. at 842, 856, and simply repeating ineffective procedures without more is not sufficient, *see King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012) (a prison official is deliberately indifferent when he persists with inappropriate treatment); *Ross v. Fogam*, No. CV 411-198, 2018 WL 1400446, at *6 (S.D. Ga. Mar. 20, 2018) (persisting in treatment known to be ineffective is deliberate indifference).

A jury could quite reasonably conclude that Stroh and Keith realized, after four consecutive days of no medication despite the string of question marks in his MAR, that merely jotting down question mark was not communicating Mr. Henegar's medical need with medical staff, but yet took no further action to ensure medical staff were made aware of the problem. Defendants "'cannot simply ignore an inmate's plight' where they are on notice that there is a risk to the inmate's health or safety." *Martinez v. Garcia*, 2012 WL 266352, *5 (N.D. Ill. Jan. 30, 2012) (quoting *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). Such a failure to act can be deliberate indifference. *See Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir.

19

1990) ("When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference") (internal citation and quotation marks omitted); *see also Goebert v. Lee Cty.,* 510 F.3d 1312, 1328 (11th Cir. 2007) ("Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness.").

Second, even if the medical staff did in fact receive notice of Mr. Henegar's missing medication, there is still a dispute as to whether the Officer Defendants took reasonable measures to obtain medical care in light of the medical staff's failure to respond. "[N]onmedical officers may be found deliberately indifferent if 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *King*, 680 F.3d at 1018. If it is evident to a layperson that the prisoner was receiving inadequate treatment, nonmedical prison officials can be liable for deliberate indifference. *Stallworth v. Graham*, No. 4:14-CV-00134-RDP, 2015 WL 4756348, at *5 (N.D. Ala. Aug. 11, 2015) (citing *Johnson*, 433 F.3d at 1011) (noting that although prison officials may typically rely on the judgment of medical professionals, there is an exception "where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment"); *see also Kelly v. Ambroski*, 97 F.

20

Supp. 3d 1320, 1343 (N.D. Ala. 2015) (nonmedical prison staff are protected from deliberate indifference only if there is an "absence of a reason to believe, or actual knowledge, that medical staff is administering inadequate medical care"). Here a reasonable jury could conclude that Stroh and Keith knew medical staff were administering inadequate medical care (*i.e.*, no care at all) because it was obvious to them that Mr. Henegar was supposed to receive his prescription but was not. *Farmer*, 511 U.S. at 836. A layperson would know this. So did Stroh and Keith; they do not assert otherwise.

The record here establishes that Officer Defendants knew either that (1) notice of Mr. Henegar's missing medication was not reaching the medical staff; or (2) the medical staff received notice but hadn't obtained more medication. Ds' SOF ¶101; P's SOF ¶53. A jury could reasonably find Stroh and Keith liable under either set of facts. If the officers believed medical staff had seen their question marks, it would be reasonable for a jury to infer that Officer Defendants knew that the nurses were not providing Mr. Henegar's medication in spite of that knowledge. Nonmedical officials must take reasonable measures to secure medical attention if they know that medical staff are ignoring the problem, as by calling a nurse. *King*, 680 F.3d at 1018; *Stallworth*, No. 4:14-CV-00134-RDP, 2015 WL 4756348, at *5; *Johnson*, 433 F.3d at 1011; *Kelly*, 97 F. Supp. 3d at 1343. Stroh and Keith did *nothing*.

21

For similar reasons, summary judgment is inappropriate even if this Court credits Keith's testimony that at 9:00 p.m. on August 31, he told Mr. Henegar that he should go to Medical the next day. Resp. to Ds' SOF ¶98. Keith knew that Mr. Henegar had not gotten Dilantin for four days, P's SOF ¶53; Ds' SOF ¶101, and given that knowledge, a jury could reasonably find that suggesting Mr. Henegar take care of it himself the next day, without any prompt action by Keith himself, was deliberate indifference. This is especially true given that Keith easily could have, for example, called the nursing supervisor or the on-call doctor, which he knew he could do in the event of a discrepancy with medication or urgent medical situation, P's SOF ¶¶7-8; Resp. to Ds' SOF ¶60, and which Keith could do at 9:00 p.m. when Mr. Henegar could not. And since neither Stroh nor Keith knew if there was Dilantin at the facility, a jury could find that it was not reasonable for them to think that sending Mr. Henegar to medical would actually result in him getting his medication. P's SOF ¶¶12-13; Ds' SOF ¶76 n.5.

There are several facts in dispute between the parties, including Defendants themselves. But under any set of facts, taken in the light most favorable to Mr. Henegar as required at this stage, a reasonable jury could find that Officer Defendants were deliberately indifferent.

**II.    Fact Issues Preclude Summary Judgment for Medical Defendants' Failure to Provide Mr. Henegar's Medication**

There is sufficient evidence for a reasonable jury to conclude that any or all of Defendants Lee, Harrell, and McDade, in addition to Stroh and Keith, were deliberately indifferent to Mr. Henegar's serious medical need by failing to give him Dilantin knowing that he had not received it.[3] The jury could find them liable in two independent ways. First, Stroh and Keith have pointed the finger at the Medical Defendants: they testified that medical providers reviewed the MAR and saw the question marks or were otherwise directly informed about Henegar's missing medication, but did nothing. A jury will hear testimony that there are no circumstances under which this is appropriate, P's SOF ¶27, and could find such dereliction to be deliberate indifference. *See, e.g., Sparks*, 724 F. App'x at 694; *Goebert,* 510 F.3d at 1328.

Second, even if the jury chooses not to credit Stroh and Keith, it could reasonably infer that Medical Defendants became aware that Mr. Henegar's Dilantin was missing through other channels. In either case, the evidence, taken in Mr. Henegar's favor, supports a jury finding that Lee, Harrell, and/or McDade knew that Mr. Henegar was out of medication and did

---

[3] Plaintiff does not oppose summary judgment in favor of Nurse Melton.

nothing to address it. Each of these scenarios presents an independent basis on which a jury could find Medical Defendants liable.

### A.   The evidence supports a finding that Defendant Lee was deliberately indifferent

Defendant Lee worked at Walker every day between August 29 and August 31, from about 5:00 a.m. until about 2:00 p.m. Ds' SOF ¶22. She was the only medical staff member who was at the prison at the same time as Stroh and Keith. P's SOF ¶58. During those days, she conducted the 5:00 a.m. and lunchtime pill calls. *Id.* ¶51.

Stroh and Keith say they attempted to alert medical staff about Mr. Henegar's missing medication by writing the question mark in the MAR, Ds' SOF ¶¶69-71, and Melton testified that the 5:00 a.m. pill-call nurse saw previous night's MARs, P's SOF ¶46. While a jury could conclude this approach was not reasonable, and/or that Stroh and Keith acted unreasonably by doing nothing when they realized Medical Defendants were not responding, *see supra*, p.15-22, it could also credit their testimony and conclude that Lee, who conducted the 5:00 a.m. pill call, saw the question marks and realized that Mr. Henegar was missing his medication. It would have been readily apparent to anyone looking at Mr. Henegar's file (1) that he had not received medication since August 27, and (2) that it was not

24

because he was declining to take it or failed to show up at pill call (as would have been indicated by the markings "R," "A/W," or "N"). P's SOF ¶¶41-42, 46-48; Ds' SOF ¶¶93, 97. And because question marks were not designated MAR markings and signaled something was wrong, a jury could also conclude that Lee realized something was wrong with Mr. Henegar's medication. P's SOF ¶¶42-43; *see also Parsons*, 491 F. App'x at 605 (testimony that medical providers conduct medication "chart reviews" raises inference that they were aware plaintiff was not getting seizure medicine).

Alternatively, if a jury believes Lee's testimony that she did not know the Dilantin was missing, she still faces liability for deliberate indifference because she knew she was supposed to be checking the MAR, and did not, even though she understood the risks of seizure patients not getting their medication. P's SOF ¶55. A medical provider's failure to check medical records can be the basis for deliberate indifference. *See, e.g., Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir. 1990) (failure to review inmate's file or evaluate him can constitute deliberate indifference if doing so would have alerted medical provider to a problem with inmate's health); *Stoner v. Fye*, No. 5:15-CV-102 (CAR), 2017 WL 1294439, at *7 (M.D. Ga. Mar. 31, 2017) (failure to review plaintiff's file does not absolve medical provider of responsibility to provide care that would have been evident from reviewing

the file). This would allow an independent finding of deliberate indifference against Lee, in addition to Stroh and Keith.

There is other evidence that Lee had direct knowledge that the Dilantin was missing. There was a post-it note on Mr. Henegar's file, sticking up like a flag, specifically noting that his medication had been ordered. P's SOF ¶50. Because there were more typical methods of recording that medication had been ordered, including in the Binder, there was no reason to put a post-it on an inmate's file unless something was amiss. *Id.* ¶48. Anyone looking at the pill cart would have noticed it and understood there was a problem with the medication.[4] *Id.* And the fact that Lee conducted two pill calls per day means she had two occasions each day to look through the MAR book. *Id.* ¶51. It is reasonable to infer that she saw the post-it and realized there was a problem.

On top of that, Mr. Henegar once went to a daytime pill call asking after his Dilantin. P's SOF ¶59. Defendant Lee conducted two of the three daytime pill calls. Although Mr. Henegar is unsure which nurse he talked to,

---

[4] Defendants have not been able to locate this post-it, but Defendant Harrell testified that she saw a photocopy of the post-it in the nursing office around the time this lawsuit was filed. P's SOF ¶102. Harrell testified that the only reason she can think of for having seen the post-it and the MAR photocopy is if Defendant McDade was showing it to them after the litigation began. *Id.*

there is a two out of three chance he talked to Lee, and thus a jury could reasonably infer Mr. Henegar spoke with Lee. Because a preponderance of the evidence standard "demands only 51% certainty," *Nat'l Lime Ass'n v. Envtl. Prot. Agency,* 627 F.2d 416, 453 n.139 (D.C. Cir. 1980) (internal citation omitted), a jury could accordingly conclude based on this evidence that Lee was aware of Mr. Henegar's missing medication and did nothing.

Finally, Defendant Keith testified that he spoke to a medical provider about Mr. Henegar's missing medication. Ds' SOF ¶101. The only person that could have been was Defendant Lee on August 29. *See supra*, p.24; P's SOF ¶58. A jury is entitled to believe Keith and conclude that Lee knew on August 29 that Mr. Henegar was out of medication, but went to work for three more days without attempting to procure the medicine for him. That is a classic form of deliberate indifference. *See, e.g., Sparks*, 724 F. App'x at 694; *Goebert,* 510 F.3d at 1328.

## B.   The Evidence Supports a Jury Finding against Defendant Harrell and/or Defendant McDade

In addition to holding Lee liable, a jury could reasonably conclude that one or both of the remaining Medical Defendants knew about the missing Dilantin. These findings, which may be cumulative or in the alternative, will depend on how the jury resolves the conflicts in the evidence.

(1)   Nurse Harrell

The evidence shows notice to Harrell via her review of the prescription order binder and via her inventory and stocking of the pill cart. Medical tracked medication orders in a binder ("the Binder") in which prescriptions were recorded when ordered, as Henegar's was, P's SOF ¶¶49, and checked off when received, *id.* ¶30-31; Resp. to Ds' SOF ¶54. It would have been apparent to anyone looking in the Binder that Mr. Henegar's medication had not arrived when it should have. P's SOF ¶35.

Defendant Harrell was primarily responsible for processing medication and stocking the pill cart. P's SOF ¶¶32, 38; Ds' SOF ¶¶48, 56. As a result, she checked the Binder every day unless McDade had already done it. P's SOF ¶¶32, 34. Thus a reasonable jury could find that Harrell checked the Binder between August 28 and August 31 and therefore knew that Henegar was missing his doses.

Harrell also inventoried the pill cart on Mondays or Wednesdays, and Mr. Henegar's medication was missing Monday through Thursday. P's SOF ¶39. Inventorying the cart would reveal that Henegar had an active prescription for which there were no drugs on the cart. This is an additional route for the jury to infer that Harrell knew Henegar's medication was missing, but did nothing about it.

28

Likewise, because restocking the cart and reviewing the Binder were required parts of the job, and a failure to do so creates substantial risks of inmates not receiving medication, if Harrell failed to become aware of Mr. Henegar's missing medication because she did look in the Binder or inventory and restock the cart, the jury could find that to be deliberately indifferent, as well. *Parsons*, 491 F. App'x at 605; *Greason*, 891 F.2d at 835; *Stoner*, 2017 WL 1294439, at *7. If the jury concludes that Harrell did not look at the Binder because McDade told her that she had already or was planning to do it, then the failure to inventory and restock the pill cart is still a sufficient basis for Harrell's liability.

(2)   Nurse McDade

There are two facts that could lead a reasonable jury to conclude that McDade was aware of the problem with Mr. Henegar's missing medication. First, like Harrell, McDade sometimes processed medications and checked the Binder. P's SOF ¶32. One or the other of them was responsible for checking it daily. *Id.* The jury will have to decide whether one of them did it all four days; they each did it over the course of the four days; or one or both of them failed to check knowing of the risks to the patients by this failure. If the jury concludes that McDade checked or should have checked on some of those days, it can find against McDade along with Harrell.

29

Second, the record contains an admission by McDade that she knew about Mr. Henegar's missing medication. Stroh called McDade at home in the middle of the night when Mr. Henegar had his first seizures, P's SOF ¶63, and says that McDade told him during that call that Mr. Henegar's medication was "on order." *Id.* ¶64.

Construing the facts in Mr. Henegar's favor, McDade knew the Dilantin had not arrived. And because the same records showing the order had not arrived also demonstrate that Henegar was out of medication, it is reasonable to infer that McDade also knew that Mr. Henegar had missed doses. Specifically, McDade was at Walker from August 28 through August 31, P's SOF ¶57, and learned on at least one of those days that Mr. Henegar's medication had been ordered. The only reason she would have been aware of this is if she had seen the MAR, the post-it, or the Binder, or had been told by another nurse that Mr. Henegar's medication was on order. As explained above, any one of those sources would also have indicated to her that Mr. Henegar had missed doses of Dilantin. P's SOF ¶¶30-35, 40-43, 47-48. Immediately upon learning this, she could have gotten him a dose from the standard ward inventory or contacted the local pharmacy. *Id.* ¶60. But she did not so much as investigate how long Mr. Henegar had gone without his medication. A reasonable jury could find her failure to do anything about the

30

medication deliberately indifferent. *See, e.g., Sparks*, 724 F. App'x at 694; *Goebert,* 510 F.3d at 1328.[5]

### C.   McDade Is Separately Liable as a Supervisor

There is an alternative explanation for Mr. Henegar's missing medication that also creates an inference of deliberate indifference: Harrell and Lee did not check the MARs or follow-up on the missing medication because their supervisor, Defendant McDade, never required them to. Supervising a nursing staff without assigning these tasks would be deliberate indifference by Defendant McDade, who was responsible for setting policies and ensuring patients got their medication.

To succeed on a claim of supervisory liability under § 1983, Mr. Henegar must present facts that (1) there was a constitutional deprivation, which he has done, *see supra*, p.10-12; and (2) that, as relevant here, McDade's failure to implement certain policies was deliberately indifferent

---

[5] Defendants attempt to muddy the waters by arguing that Mr. Henegar could have spoken about his missing Dilantin with Connie Willingham, the only other nurse at Walker. This would not be a reasonable inference. For one, as discussed, the only nurse Keith overlapped with at any time was Defendant Lee. P's SOF ¶58. Second, Nurse Willingham had duties in the RSAT unit, a separate building down the hill from the main Walker facility (where Mr. Henegar lived and went to pill call). *Id.* ¶28. She worked only in the RSAT unit and had no duties in the main unit, even in Nurse Melton's absence. *Id.* ¶28-29. Thus it would not be reasonable to infer that Mr. Henegar went to pill call and told Nurse Willingham about his missing medication. Plaintiff is entitled to the inference in his favor here.

and was a cause of Mr. Henegar's injuries. *See Sorensen v. Nocco*, 677 F. App'x 570, 573 (11th Cir. 2017); *Williams v. Santana*, 340 F. App'x 614, 617 (11th Cir. 2009) (internal citations omitted); *Simpson v. Stewart*, 386 F. App'x 859, 860 (11th Cir. 2010) (there must be a causal connection or "direct link" between the policy and the constitutional deprivation); *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (policymaker's deliberate indifference can be found when there is a direct link between lack of policies and harm). A causal connection can be established in a number of ways, such as when the injury arises from "haphazard and ill-conceived procedures." *Greason* 891 F.2d at 837 n.18.

Defendant McDade asserts that she is not liable as a supervisor because Mr. Henegar's incident was isolated and she was unaware of any other similar incident having occurred at Walker. Dkt. 146-1 at 15-18. That may be true, but it does not entitle her to summary judgment because a prior similar injury is not the *sine qua non* of deliberate indifference. What matters is awareness of the *risk* of injury, which a jury could find based on the obviousness of the risk even if the risk had not manifested in injury thus far. *Woodward*, 368 F.3d at 929. Accordingly, if Mr. Henegar's lack of medicine was a "'highly predictable consequence' of the [supervisor's] failure to act," the jury can hold McDade liable for it. *Id.*

Thus, to McDade's argument, notice of a widespread problem is not necessary to establish deliberate indifference by a policymaker. *Simpson*, 386 F. App'x at 860 (causal connection and supervisor liability imposed by either notice of history of widespread abuse *or* where supervisor's improper policy "results in deliberate indifference to constitutional rights") (emphasis added). A supervisor's failure to implement reasonable policies in the face of a known risk, like the fact that prescription medications can run out, is deliberate indifference. *Simpson*, 386 F. App'x at 860; *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir. 1991) ("liability may be imposed due to the existence of an improper policy or from the absence of a policy"); *Greason*, 891 F.2d at 838 (must act reasonably if risk is known); *Sparks*, 724 F. App'x at 695 (lack of seizure medicine is obvious, objectively serious risk).

The parties agree that a failure to ensure that seizure patients receive their medicine can have serious health consequences. McDade agrees that failing to implement policies that ensure medical personnel are made aware of problems with inmates' medication could carry serious health risks. P's SOF ¶ 17. The only question is whether a jury could find a "direct link" between McDade's lack of policies and the failure to get Mr. Henegar his medicine.

Here a jury reasonably could find a direct link in several ways, including the failure to set up reasonable policies and/or training for the officers to alert medical staff when a medicine runs out, and a failure to assign responsibilities among the staff to check if medicine had run out. For any and all of these failures, Plaintiff's corrections expert will explain to the jury that it "defies common correction medicine practice" to not have these kinds of policies, and that "[i]t is widely acknowledged in the correctional setting that" a supervisor should enact such policies, especially when there are times when there are no nursing staff onsite. P's SOF ¶¶21-23.

For one, if a jury believes that no one from nursing actually got notice that Mr. Henegar was not receiving his medication, summary judgment must be denied for one of two reasons. First, if a jury believes the policy was indeed that Officers should write "?" and nothing more, as Stroh and Keith insist, it was a deliberately indifferent policy. This is because McDade knew no one from medical checked the MAR more than weekly, P's SOF ¶19; Resp. to M's SOF ¶27, and therefore having Officers record "?" would not ensure that nursing received information about problems *often enough* for patients like Mr. Henegar who required daily dosing. This risk, which was known to McDade, P's SOF ¶17, combined with the ease and certainty of the standard practice, which would require officers to simply call a nurse, could readily

34

lead a jury to conclude that McDade failed to take reasonable steps to address these risks.[6]

In the alternative or in addition to that scenario, a jury could also infer that no one from nursing learned about Mr. Henegar's medication because they did not know they were supposed to check the obvious sources. This, too, precludes summary judgment in McDade's favor. There is evidence that the nursing department had a policy of weekly rather than daily chart reviews, and of not checking the pill cart after the weekend and weeknight pill calls to ensure medications were received. P's SOF ¶18; Ds' SOF ¶72. McDade herself acknowledges the usefulness of reviewing MARs regularly, and the serious consequences of a failure to review MARs. Nevertheless, she intentionally did not create a policy to ensure that the MARs *were* checked every day, without any legitimate medical purpose. P's SOF ¶20. She also understood the need for policies to guarantee certain nursing tasks were accomplished. *Id.* ¶¶15-16. Here, however, she says that her subordinates were responsible for looking at the MARs and checking the pill cart, but she never actually told them that or implemented any polices to ensure these tasks were completed.

---

[6] It is important to note that this does not preclude a finding of deliberate indifference against the Officer Defendants, because as discussed *supra*, p.18-22, they could be liable once they realized that medical was not providing care.

*Id.* ¶24. The jury will hear expert evidence that a failure to implement policies that required medical staff to review the MARs, review the medication orders, and inventory the pill cart more than once per week when medication is distributed without medical staff onsite defies common correction medicine practice. *Id.* ¶¶21-23. The jury could conclude that this failure was deliberate indifference.

A reasonable jury could also believe that each of the medical staff thought that it was someone else's responsibility to review inmates' records, in which case McDade's failure to define the roles while assuming the employees would just work it out among themselves was separately or cumulatively unreasonable. *See Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017) (en banc) (failure to implement policies ensuring coordination of care is deliberate indifference). What's more, McDade knew that Nurse Melton was in charge of checking the Binder and the MARs, and that she would not be doing it while she was on medical leave. Yet McDade still failed to clearly delegate those responsibilities to other nurses or take them on herself. Ds' SOF ¶¶46; P's SOF ¶25. It was not reasonable for McDade to assume the nurses would assign these duties amongst themselves without even mentioning it to them, or at least a jury could so find. *Greason*, 891 F.2d at 837 n.18.

36

Lastly, McDade owed a responsibility to monitor her supervisees and check their work for errors. *See Montano v. Orange Cty.*, 842 F.3d 865, 871 (5th Cir. 2016) (failing to review work of supervisee can be deliberate indifference). This abject failure to supervise, combined with the hefty evidence that she was aware of a need for policies to ensure that medical learned about problems with pill call or medication supplies, could convince a jury that McDade failed to take reasonable steps to address a known risk, and thus that she was deliberately indifferent.

McDade's final argument is that her failure to implement policies was not the "moving force" behind the constitutional violation—in other words, that a reasonable jury could not find the absence of policies resulted in the denial of medical care to Mr. Henegar. But she herself acknowledges that Mr. Henegar's missing medication was due to a failure of this communication. P's SOF ¶26. A jury could readily infer from this testimony that if McDade had created appropriate policies, necessary communication would have occurred to provide Mr. Henegar his medication and prevent his seizures. McDade's argument is therefore without merit.

Singularly or together, a jury could find these "haphazard and ill-conceived" policies (or non-policies, for that matter) were unreasonable in light of the known risks, *Greason* 891 F.2d at 837 n.18, and ultimately caused

Mr. Henegar to not receive his Dilantin and have two seizures. Defendant McDade is not entitled to summary judgment.

## III.   Defendants Cannot Win Summary Judgment by Blaming Mr. Henegar for His Own Lack of Medical Care

Defendants attempt to justify their clear deliberate indifference by shifting the blame to Mr. Henegar, an incarcerated person with no ability to provide medical care for himself. Defendants argue, without citation, that when an inmate has access to multiple mechanisms to ask for medical care and does not exhaust each one, his constitutional protections disappear. This suggestion is not only contrary to the law, but it is nonsensical because it would allow prison officials to serially ignore medical problems because an inmate could always just notify someone else.

Moreover, Defendants' assertion is not grounded in the evidence. A jury could reasonably decide that Mr. Henegar did enough to notify prison officials of his medical need, including by going to pill call—the place he had been instructed to go in order to get medicine—five times. M's SOF ¶13; P's SOF ¶59. He had no reason to think that he would have more success somewhere else in the prison. And while Defendants say that Mr. Henegar knew he could stop by the sick bay for medical *treatment*, they point to no evidence suggesting that Mr. Henegar knew he could get *medication* at that location,

much less that he would actually have received it had he gone there. *See* Ds'
SOF ¶¶77-86. On top of that, as discussed, *supra,* p.22, Mr. Henegar was not
told until 9:00 p.m. on August 31 to go to medical to see about his Dilantin,
and of course, by the time medical arrived the next day, he had already
suffered his seizures.

And at any rate, there is no concept of contributory fault under Section
1983. *Burton v. City of Adairsville*, No. 4:14-CV-0099-HLM, 2014 WL
12543885, at *4 (N.D. Ga. Sept. 22, 2014) (citing *Katka v. Mills*, 422 F. Supp.
2d 1304, 1308 (N.D. Ga. 2006) (collecting cases)). Rather, under Section 1983,
each defendant is jointly and severally liable. *Wright v. Watson*, No. 4:15-CV-
34 (CDL), 2017 WL 4126981, at *2 (M.D. Ga. Sept. 18, 2017) ("the Eleventh
Circuit and its predecessor have found that joint and several liability applies
in § 1983 damages actions") (collecting cases).

Despite the clear law in this area, Defendants rely on two cases to
support their novel theory, neither of which lends any support. First, *Harris
v. Thigpen* is an institutional-level challenge that stands for the familiar
standard that prisoners are entitled to "some" medical care and not the best
medical care. 941 F.2d 1495 (11th Cir. 1991). It says nothing about the efforts
a prisoner must take to obtain medical after giving notice. It is hard to
imagine how this case supports the additional burden Defendants seek to add

into the deliberate indifference analysis, given that Mr. Henegar received no medical care at all. *Goins v. McNeil* also does not help Defendants because it addresses complaints raised by a plaintiff after he was evaluated by a nurse who exercised her medical judgment and told him that he should wait to see a doctor. No. 3:10CV551/LAC/EMT, 2011 WL 3859966, at *7-*8 (N.D. Fla. Aug. 18, 2011), report and recommendation adopted, No. 3:10CV551/ LAC/ EMT, 2011 WL 3860021 (N.D. Fla. Sept. 1, 2011). The *Goins* court found no deliberate indifference because the nurse's advice had been based on medical professionals' judgment, which is all that the law requires. *Id.* That is a far cry from Mr. Henegar's situation, in which he was evaluated by no one and then serially ignored despite asking for medicine.

Beyond that, Eleventh Circuit Pattern Jury Instruction 5.8 discusses only the defendants' awareness and actions. 11th Cir. Civ. Pattern Jury Inst. 5.8. It says nothing about the plaintiff's actions, and so the jury will have no framework to hear this evidence in the first place. And as discussed, even if they did, the evidence supports a reasonable finding that Mr. Henegar acted appropriately under the circumstances. Defendants are not entitled to summary judgment on this point.

## IV.    The Jury Could Find That Defendants Caused Mr. Henegar's Injuries

It is undisputed that Defendants' failure to give Mr. Henegar his

Dilantin caused his seizures. P's SOF ¶¶82, 83. McDade briefly notes that

Mr. Henegar also filed a lawsuit against the doctor at the hospital he visited

between seizures, perhaps suggesting that the deprivation of care Mr.

Henegar experienced at Walker did not cause his second seizure. That spin is

incorrect. Ordinary rules of tort causation apply to constitutional tort suits,

and McDade is responsible for all reasonably foreseeable consequences of her

misconduct if found liable at trial. *Malley v. Briggs*, 475 U.S. 335, 344 n.7

(1986); *Monroe v. Pape*, 365 U.S. 167, 187 (1961); *Brooks v. Wilkinson Cty.*,

393 F. Supp. 3d 1147, 1165 (M.D. Ga. 2019). Causation is an issue of fact for

a jury to decide. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840-41

(1996); *Brooks*, 393 F. Supp. 3d at 1165. At this stage, McDade is required to

show that the factual record, construed in Plaintiff's favor, presents no

genuine dispute about causation. She has done nothing of the sort.

## V.    There is a Question of Fact on Defendant Harrell's Statute of Limitations Defense

Plaintiff did not name Defendant Harrell within the limitations period,

but there is sufficient evidence for a jury to find that the statute of

limitations should be tolled because Plaintiff suffers from mental incapacity

that was caused by Harrell's actions. Whether to toll the limitations period in a Section 1983 action is generally determined by reference to state law. *Wallace v. Kato*, 549 U.S. 384, 394 (2007). Under Georgia law, a statute of limitations is tolled for a person who is "legally incompetent because of mental retardation or mental illness" at the time a cause of action accrues, with the tolling continuing until the "disability is removed." O.C.G. § 9-3-90(a); *see also* O.C.G. § 9-3-91. There is no bright-line test for mental incompetence; rather, the inquiry is one of capacity—"whether the individual, being of unsound mind, could not manage the ordinary affairs of his life." *Lawson v. Glover,* 957 F.2d 801, 805 (11th Cir. 1987) (internal citation and quotation marks omitted). A "plaintiff need not be so mentally incompetent that she requires confinement or a guardian." *Meyer v. Gwinnett Cty.*, 716 F. App'x 857, 861 (11th Cir. 2017) (quoting *Martin v. Herrington Mill, LP*, 316 Ga. App. 696, 697 (2012)).

Drawing on principles of equitable tolling, a plaintiff may also establish that the statute of limitations should be tolled if he experiences mental incapacity "as a result of the occurrence giving rise to the cause of action" and otherwise exercised diligence in filing the claim. *Lawson*, 957 F.2d at 805 (quoting *Lowe v. Pue,* 150 Ga. App. 234, 236 (1979)). He must show a causal connection between the incapacity and the delay in filing. *See Echemendia v.*

*United States*, 710 F. App'x 823, 827 (11th Cir. 2017) (impairments can be basis for equitable tolling when "there is connection between the incapacity and delay in filing") (citing *Lawrence v. Florida*, 421 F.3d 1221, 1226-27 (11th Cir. 2005).

Questions of mental incapacity and equitable tolling are ones of fact "to be determined by the jury." *Meyer*, 716 F. App'x at 861 (quoting *Tri-Cities Hosp. Auth. v. Sheats*, 156 Ga. App. 28, 30 (1980)); *Weissman v. Williams*, No. 1:15-CV-40(WLS), 2017 WL 11404587, at *10 (M.D. Ga. Sept. 29, 2017) (equitable tolling is question for jury) (citing *Smith v. SunTrust Bank*, 754 S.E.2d 117, 124 (Ga. Ct. App. 2014)). Thus, to determine whether a limitations period should be tolled, courts examine whether a plaintiff relies on other people to help him perform daily activities like buying groceries and paying bills; whether the disability has made it impossible for the plaintiff to prosecute his claim; and whether the defendants' conduct at issue in the lawsuit caused the mental incapacity. *Lawson,* 957 F.2d at 805; *Meyers v. Gwinnett Cty.*, No. 1:14-CV-0066-WBH, 2015 WL 12856022, at *2 (N.D. Ga. Jan. 26, 2015) (reversed on other grounds).

There is evidence that Mr. Henegar's seizures permanently damaged his short-term memory in a manner sufficient to justify tolling the statute of limitations as to Harrell. P's SOF ¶¶87-89. Because of his brain damage, Mr.

Henegar cannot perform job duties because he forgets "day to day" what he is "supposed to be doing." *Id.* ¶92. He now struggles with grocery shopping, and remembering to pay his bills and go to doctor appointments. *Id.* ¶93. After his release from GDC, he moved in with his mother, on whom he relies to manage these ordinary life tasks. *Id.* ¶95. He has to write multiple daily journal entries to keep track of daily events, and to remind himself of things he has to do, conversations he's had, and recent events or occurrences, and even then forgets to look at them. *Id.* ¶94.

This incapacity, combined with the equitable considerations that (1) Mr. Henegar experiences a disability now *because of* Harrell and other defendants' conduct; (2) this lawsuit is based on that disability and that conduct; and (3) because of his disability he was unable to remember that Harrell was one of the nurses responsible for getting him his medication, creates a factual dispute about whether the limitations period should have been tolled.

And while equitable tolling also requires a showing of diligence, a jury could find in Mr. Henegar's favor on that point, too. Within about four weeks of learning that Harrell was the remaining nurse responsible for failing to provide his medication, he acted to add her as a defendant. *See* Ds' SOF ¶34; Resp. to Ds' SOF ¶34. This was diligent. *See Ainsworth v. Cmty. Bible*

*Church*, No. 1:10-CV-01964-SCJ, 2011 WL 13274226, at *4 (N.D. Ga. Dec. 5, 2011) (granting leave to amend when Plaintiff moved to amend at the earliest opportunity); *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381 (5th Cir. 1985) (no prejudice when plaintiff requested leave to amend complaint when he "had diligently sought discovery" and "had asked for the amendment promptly upon discovering the basis for the new allegations").

Under these circumstances, a jury could find that it would not be fair to charge Mr. Henegar "with the running of the clock." *Meyer*, 716 F. App'x at 861 (11th Cir. 2017) (internal citation and quotation marks omitted). Harrell cannot be excused from this lawsuit at summary judgment.

## VI.   A Jury Could Find Defendant McDade Deliberately Indifferent for Telling Officers Not to Call 911

In addition to the foregoing, there is also sufficient evidence for a jury to find that McDade exhibited deliberate indifference toward Mr. Henegar by telling officers not to call 911 as soon as she learned about his second seizure. Using the familiar analysis, in order to show that a jury could find a delay in his medical care unconstitutional, Mr. Henegar must show that the delay was deliberately indifferent. *See Mace v. Johnson*, No. CIV. 11-0477 MJD/LIB, 2014 WL 538580, at *12 (D. Minn. Feb. 11, 2014) (court must evaluate "totality" of medical defendant's conduct to determine whether he "collected

enough information to sufficiently understand Plaintiff's condition before making such an important treatment decision") (citing *Steele v. Shah*, 87 F.3d 1266, 1267 (11th Cir. 1996), as amended (Sept. 6, 1996) and *Greason*, 891 F.2d at 840). A jury could make such a finding here.

Stroh told McDade during their phone call that that Henegar was having a seizure, but that he had not seen him. P's SOF ¶¶68-70. Stroh also testified that he may have told McDade that Mr. Henegar was not actively seizing, and that he gave her no additional information. *Id*. ¶70-71. Regardless, the facts taken in Mr. Henegar's favor establish that Stroh did not provide any information to McDade about Mr. Henegar's appearance or vital signs. *Id*. They also establish that McDade knew seizures can have life-threatening consequences, and that Mr. Henegar was at risk for a third seizure. *Id*. ¶¶73-74. Despite this knowledge, and even though it is standard practice in the corrections setting to call for an ambulance immediately after a patient has a seizure—especially when a medical provider cannot observe the patient or does not have information about the patient's vital signs, *id*. ¶¶73-78—McDade told Stroh not to call 911. Without reliable information on Mr. Henegar's condition, McDade decided that Mr. Henegar should lay there for over 30 minutes until the first nurse arrived at work that day. Ds' SOF ¶115; P's SOF ¶79. A jury could reasonably find McDade's decision

deliberately indifferent. *See Mace*, 2014 WL 538580, at *12 (it is deliberate indifference to base a medical decision on information that is obviously insufficient).

As for whether the delay injured Mr. Henegar, the jury can find that the delay itself is injury, as it left him suffering needlessly, in and out of consciousness and in respiratory distress after seizing a second time. P's SOF ¶72; *Brown*, 894 F.2d at 1538 ("Deliberately inflicted pain … does not become unimportant and unactionable under the eighth amendment simply because the pain produced is only momentary."); *McElligott*, 182 F.3d at 1257 (delay in treating pain, even if momentary, can be deliberate indifference); *Harris*, 21 F.3d at 394 ("deliberate indifference could be inferred from an unexplained delay in treating a known or obvious serious medical condition").

It took 37 minutes for a nurse to arrive after Stroh learned about Mr. Henegar's seizure. Ds' SOF ¶112; P's SOF ¶79. When she arrived, Nurse Lee determined that Mr. Henegar's oxygen level was dangerously low at 81% at that time, P's SOF ¶81, and likely had been even lower in the half-hour before that. On top of the trauma of his first and second seizures themselves, Mr. Henegar suffered in respiratory distress without any medical care for 37 needless minutes, in spite of the typical practice to call 911 right away. *Id.*

¶¶75, 77-78. That is sufficient for a jury to find a constitutional violation. *See Brown*, 894 F.2d at 1538; *McElligott*, 182 F.3d at 1257.

## VII.   This Is Not A Qualified Immunity Case

To win summary judgment on the issue of qualified immunity, Defendants must establish that they did not violate any clearly established constitutional rights under any set of facts that the jury could reasonably find. Defendants have not done that. Instead, their qualified immunity argument is really a reprise of their substantive argument.

Defendants' argument for qualified immunity boils down to an assertion that they did not violate the Constitution because they were not on notice of Mr. Henegar's need for or denials of care (Medical Defendants) or took appropriate steps to address it (Officer Defendants). *See* Dkt. 147-1 at 26-28; Dkt. 148-1 at 24-25. This Court must construe the facts in Mr. Henegar's favor at this stage and ask whether the law was sufficiently developed in August 2016 to put a reasonable official on notice that ignoring the need for Dilantin and ignoring the need for post-seizure medical care was unconstitutional. *Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005)). It clearly was. *See, e.g., Estelle*, 429 U.S. at 104-05 (prison authorities' failure to treat prisoner's medical needs or provide access to medical care violates the Eighth Amendment); *Sparks*, 724 F. App'x at 694 (it was clearly

established in 2015 that prison officials cannot refuse to provide seizure
medication to prisoners with seizure disorders); *Benson v. Gordon Cty*, 479 F.
App'x 315, 319 (11th Cir. 2012) (no qualified immunity for jail administrator
who knew inmate needed his prescribed medication but failed to provide it for
days); *Brown*, 894 F.2d at 1538 (unexplained delay for treatment to an
inmate with broken foot is a constitutional violation); *Duffey v. Bryant*, 950 F.
Supp. 1168, 1178 (M.D. Ga. 1997) (prison officials must "take action or inform
competent authorities" once they learn of an inmate's need for medical care).

To the extent that the Defendants' argument is that this is a novel
factual situation, it is not: wholesale denials of medical and medication that
cause actual harm were the basic factual premises facing the Court in *Estelle*,
429 U.S. 97, and its progeny. *See also Benson*, 479 F. App'x at 319 (affirming
denial of summary judgment on qualified immunity for jail administrator
who knew inmate needed his prescribed medication but failed to provide it for
days, leading to needless suffering).

And even if it were a novel situation, the Supreme Court has said that
novelty does not matter where the violation was obvious. *See Hope v. Pelzer*,
536 U.S. 730, 741 (2002). "Officials can still be on notice that their conduct
violates established law … in novel factual circumstances." *Id*. at 741; *see
also Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) ("A judicial

precedent with materially identical facts is not essential for the law to be clearly established" if it is "obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue.") The question is whether Defendants had "fair warning" that their conduct was unconstitutional. Based on the mountain of precedent establishing that prisons cannot deny patients medication,[7] and must at least notify competent officials once they learn about it, a jury can find that Defendants are not entitled to qualified immunity.

## CONCLUSION

A jury must decide this case. There are critical disputes of fact and it cannot be decided as a matter of law. Accordingly, for all the reasons articulated above, Plaintiff respectfully requests that this Court deny Defendants' motions for summary judgment.

Respectfully submitted,

/s/ Rachel Brady
Illinois Bar No. 6312402
*One of Plaintiff's Attorneys*

---

[7] Officer Defendants cannot hide behind qualified immunity by arguing that Mr. Henegar could have gotten medication himself when they did not know whether Dilantin was available in the prison or whether Mr. Henegar could have actually acquired it for himself. *See supra*, p.22.

Arthur Loevy
Mike Kanovitz
Rachel Brady
311 N. Aberdeen Street, Third Floor
Chicago, IL 60607
312-243-5900
brady@loevy.com

Zack Greenamyre, Georgia Bar No. 293002
Mitchell & Shapiro LLP
3490 Piedmont Road, Suite 650
Atlanta, GA 30305
404-812-4751
zack@mitchellshapiro.com

## CERTIFICATE OF SERVICE

I, Rachel Brady, an attorney, hereby certify that on December 30, 2020,

I filed the foregoing Plaintiff's Consolidated Response to Defendants' Motions

for Summary Judgment using the Court's CM/ECF system, which effected

electronic service on all counsel of record.


Respectfully submitted,

/s/ Rachel Brady
One of Plaintiff's Attorneys