# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ROME DIVISION

| | |
|---|---|
| DAVID HENEGAR, | ) |
| *Plaintiff,* | ) ) ) |
| | ) Case No. 4:18-cv-00192-HLM |
| *v.* | ) ) |
| GEORGIA CORRECTIONAL HEALTH, LLC, et al., | ) ) ) JURY TRIAL DEMANDED |
| *Defendants.* | ) ) ) |

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

### David Henegar

1. David Henegar is a trained welder and mechanic, and a certified diesel and pipe-weld x-ray technician. Dkt. 148-4 (Henegar Dep.) at 20:1-6, 20:24-21:16, 24-21:16.

2. He has been consistently employed in trade positions, including holding jobs as a welder, truck mechanic, and machinist. Ex. A (Resp. to Ds' ROG) ¶10; Dkt. 148-4 (Henegar Dep.) at 20:1-15, 24-21:11, 22:13-19, 26:23-27:7.

3. Mr. Henegar was in the faith and character-based program at Walker, and to get in, Mr. Henegar needed to go a year without any disciplinaries. Dkt. 148-5 (McDade Dep.) at 11:14-12:4; 275:25-276:7.

4. While in the faith and character program at Walker State Prison, Mr. Henegar tried to be positive and keep everyone in good spirits. Ex. B (Brewer Decl.) ¶14.

5. He taught other people how to weld. Ex. B (Brewer Decl.) ¶14.

### Policies Pertaining to Correctional Officers' Provision of Medical Care at Walker

6. According to Georgia Department of Corrections policy, when correctional staff are notified that an inmate has an urgent or emergency health care need while medical staff are not at the facility, they must contact they must contact the on-call medical provider or 911. Ex. C (Urgent/Emergent Policy) at Mr. Henegar 3212, 3215.

7. McDade trained Stroh and Keith to report issues with inmates' medication using the MAR and verbally to medical staff, or an on-call provider if no medical staff were available in the facility. Dkt. 148-5 (McDade Dep) at 35:3-36:19; 37:17-22, 88:1-9; Dkt. 147-4 (Harrell Dep.) at 176:13-168:3; Dkt. 148-3 (McDade Decl.) ¶9.

8. Stroh and Keith knew that they could call the on-call doctor or nurse if there was a medical problem or a discrepancy between what was in an inmate's MAR and the medication that was available, or send an email.

Dkt. 147-15 (Stroh Dep.) at 101:19-25; Dkt. 147-5 (Keith Dep.) at 125:18-126:14, 126:23-128:6, 131:24-132:2.

9. Security officers should communicate directly with medical staff if a medical situation arises. They should not merely record an extremely serious medical issue, such as a lack of medication, in a MAR, without further action. Ex. D (Report of Dr. Moore) at Henegar 014224.

10. It is common knowledge among correctional officers who provide medication to detainees that they must notify nursing staff directly about an issue with inmates' medications rather than just reporting it in the medication records. Ex. D (Report of Dr. Moore) at Henegar 014224.

11. It was not reasonable for Stroh and Keith not to contact a nurse directly about Mr. Henegar's medication being out. Ex. D (Report of Dr. Moore) at Henegar 014226.

12. Stroh had never heard of the standard ward inventory or cabinet with extra medication. Dkt. 147-15 (Stroh Dep.) at 166:19-167:6.

13. Keith did not know what medication was in the standard ward inventory. Dkt. 147-5 (Keith Dep.) at 139:14-16.

## Policies Pertaining to Nurses' Provision of Medical Care

14. It was Defendant McDade's responsibility as supervisor to enact policies and train her subordinates, the other Medical Defendants, to ensure inmates received their medication. Dkt. 148-5 (McDade Dep.) at 176:6-9, 203:4-18.

15. McDade knew that certain duties needed to be guaranteed, including having someone oversee medication, and check the pill cart to be sure medications were there. Dkt. 148-5 (McDade Dep.) at 101:17-102:18.

16. McDade knew it was necessary to have some policies, and that it would be necessary to assign work to nurses to guarantee tasks were being completed; Dkt. 148-5 (McDade Dep.) at 100:14-101:16

17. McDade knew that the lack of a policy in which someone would check to be sure inmates had received certain medications could lead to serious health risks. Dkt. 148-5 (McDade Dep.) at 204:6-207:7.

18. McDade did not have a policy that someone from medical would check the MAR every day. Dkt. 148-5 (McDade Dep.) at 203:14-204:2.

19. McDade did not enact a policy to check the MAR more than once a week because she assumed that if an issue came up in the interim, somebody would let nursing know. Dkt. 148-5 (McDade Dep.) at 102:19-103:15.

20. McDade had the authority to enact a policy in which someone from medical checked the MAR daily, but she chose not to because she did not want to micromanage. Dkt. 148-5 (McDade Dep.) at 203:14-22.

21. It defies common correction medicine practice to fail to implement policies that required medical staff to review the MARs and medication orders, and to inventory the pill cart more than once per week when medication is distributed without medical staff onsite. Ex. D (Report of Dr. Moore) at Henegar 14224-25.

22. It is widely acknowledged in the correctional setting that there should be policies requiring medical staff to check on the status of inmates' medications, including MARs, medication orders, and inventories, more than once per week, especially when there are times when there are no nursing staff onsite. Ex. D (Report of Dr. Moore) at Henegar 14225.

23. The lack of round-the-clock nursing staff on-site makes it even more critical for nursing staff to check all nursing records regularly. Ex. D (Report of Dr. Moore) at Henegar 014225.

24. McDade observed that at times, some nurses took it upon themselves to complete certain tasks, but there were no set procedures or protocols to ensure they were completed. Dkt. 148-5 (McDade Dep.) at 182:7-14, 203:14-22, 215:4-15

25. The only tasks McDade assigned after Melton went on medical leave were overseeing the pill cart and working with the prison's doctor. Dkt. 148-5 (McDade Dep.) at 100:8-23.

26. McDade acknowledges that a breakdown in communication between nursing, the pharmacy, and security caused Mr. Henegar's injuries. Ex. E (Grievance Response) at 055; Dkt. 148-5 (McDade Dep.) at 243:5-21

27. Under no circumstances is it appropriate for a prison nurse to simply ignore the situation or decline to take any steps to provide medication upon learning that an inmate's prescription was unavailable. Ex. D (Report of Dr. Moore) at Henegar 014224.

28. In August 2016, Nurse Connie Willingham was stationed down in a separate building on the Walker Prison campus, called the "RSAT unit." Dkt. 147-4 (Harrell Dep.) at 66:24-67:8.

29. Willingham was territorial and wanted to do only RSAT work. Dkt. 147-4 (Harrell Dep.) at 80:6-9.

### Processing Medications and Stocking the Pill Cart

30. After medications were ordered from the pharmacy, they were logged in a binder containing the prescription orders ("the Binder"). Dkt. 147-12 (Melton Dep.) at 105:1-25.

31. It was a nurse's responsibility to "process" medications, which means cross-checking medication that had been delivered with the orders that were logged in the Binder, and checking them off when they were received. Dkt. 148-5 (McDade Dep.) at 164:12-24; Dkt. 147-4 (Harrell Dep.) at 116:7-13.

32. McDade and Harrell "processed medications" while Melton was on medical leave, though Harrell did it most often. Dkt. 147-8 (Lee Dep.) at 57:17-25; Dkt. 147-4 (Harrell Dep.) at 87:18-88:10; Dkt. 148-5 (McDade Dep.) at 164:12-24, 279:11-17; Dkt. 147-12 (Melton Dep.) at 107:3-15.

33. Someone from the nursing staff would notice if a medication was missing. Dkt. 147-4 (Harrell Dep.) at 169:8-170:8.

34. A nurse checked the Binder more or less every day. Dkt. 147-4 (Harrell Dep.) at 124:13-24; Dkt. 148-5 (McDade Dep.) at 254:24-255:12.

35. It would have been noticed by anyone looking at the Binder if a medication had been ordered but not received. Dkt. 148-5 (McDade Dep.) at 266:5-25; 279:11-17.

36. It was the job of the person taking over for Melton to follow up on prescription orders that had not been fulfilled by the pharmacy within 48 hours of order. Dkt. 147-12 (Melton Dep.) at 104:1-17.

37. After medications were received and processed, they were stocked on the pill cart. Dkt. 147-4 (Harrell Dep.) at 268:4-18.

38. Harrell stocked the pill cart in August 2016 after Nurse Melton went on sick leave. Dkt. 147-8 (Lee Dep.) at 177:17-25; Ex. F (Harrell Interrog. Resp.) ¶6; Dkt. 147-4 (Harrell Dep.) at 268:4-18.

39. While Nurse Melton was on medical leave, Harrell inventoried the pill cart once a week on Mondays or Wednesdays. Dkt. 148-5 (McDade Dep.) at 166:10-167:1; Dkt. 147-4 (Harrell Dep.) at 156:16-25.

### Pill Call and Medication Administration Records

40. The prison official conducting pill call had a code to record in the inmate's Medication Administration Record ("MAR") whether the inmate had received the medication. Dkt. 147-5 (Keith Dep.) at 111:1-13; Dkt. 147-4 (Harrell Dep.) at 217:16-22; Ex. G (MARs).

41. As relevant here, prison officials recorded "A" for administered, "N" for no-show, "R" for refused, and "A/W" for accepted but wasted. Dkt. 147-5 (Keith Dep.) at 111:1-13; Dkt. 147-4 (Harrell Dep.) at 217:16-22; Ex. G (MARs).

42. A "question mark" is not a designated marking and it would be unusual for one to appear in a MAR. Ex. G (MARs); Dkt. 147-4 (Harrell Dep.) at 208:2-6; 272:2-8.

43. If there were a question mark in a patient's MAR, someone should have looked into it. Dkt. 147-4 (Harrell Dep.) at 272:2-273:1; Dkt. 148-5 (McDade Dep.) at 265:9-15.

44. Medical was responsible for checking the MAR for inmates who got 9:00 p.m. pills. Dkt. 147-12 (Melton Dep.) at 157:22-158:14.

45. Someone from nursing should have checked the MAR every day. Dkt. 147-12 (Melton Dep.) at 157:10-17.

46. The nurse conducting the 5:00 a.m. pill call would see the MARs from the previous night's 9:00 p.m. pill call. Dkt. 147-12 (Melton Dep.) at 156:13-21.

47. Anyone conducting pill call would see a post-it that was on a patient's MAR. Dkt. 147-12 (Melton Dep.) at 160:11-161:2.

48. It was not common for post-it notes to appear on MARs, and a post-it signaled that something was wrong. Dkt. 147-12 (Melton Dep.) at 160:11-161:2.

**Defendants' Failure to Provide Medication from August 28-August 31**

49. Melton logged Mr. Henegar's Dilantin order into the Binder when she sent the order to the pharmacy on August 23. Dkt. 147-12 (Melton Dep.) at 113:6-114:21; Dkt. 147-13 (Physician's Orders Form).

50. Between August 28 and August 31, there was a post-it note sticking out of Mr. Henegar's MAR like a flag. Dkt. 147-5 (Keith Dep.) at 131:3-11.

51. Lee conducted the 5:00 a.m. and lunchtime pill calls between August 28 and August 31, 2016. Dkt. 147-8 (Lee Dep.) at 65:17-22.

52. Keith logged an unidentifiable marking that was not an "A" in Mr. Henegar's MAR on August 28, and a question mark in Mr. Henegar's MAR for August 31. Ex. G (MARs).

53. On August 31, Stroh and Keith were at pill call and knew that Mr. Henegar had not received medication for at least three days. Ex. G (MARs); Dkt. 147-5 (Keith Dep.) at 147:12-23; Dkt. 147-15 (Stroh Dep.) at 153:19-22; Resp. to Ds' SOF ¶98.

54. Keith and Stroh knew that failing to provide an inmate with prescription medication for four days could carry very serious medical risks.

10

Dkt. 147-5 (Keith Dep.) at 140:19-141:10; 152:20-24; Dkt. 147-15 (Stroh Dep.) at 165:18-15.

55. Lee knew it was important to provide seizure medication to Mr. Henegar. Dkt. 147-8 (Lee Dep.) at 233:20-234:9.

56. Between August 28 and 31, 2016, Stroh took no steps to ensure that Henegar got his Dilantin. Dkt. 147-15 (Stroh Dep.) at 163:18-164:12.

57. McDade worked weekdays from 8:00 a.m. until 4:30 p.m. Dkt. 148-5 (McDade Dep.) at 73:10-13.

58. The only nurse Keith ever overlapped with between August 28 and August 31, 2016, with was Lee on Monday, August 29 between approximately 5:00 a.m. when Lee arrived at Walker and 5:04 a.m. when Keith signed out of work. Dkt. 147-6 (Keith Time Records) at 0293; Dkt. 147-10 (Lee Time Records) at Henegar 13310-13311; Ds' SOF ¶27; Dkt. 148-5 (McDade Dep.) at 73:10-13.

59. Mr. Henegar told a nurse that his Dilantin was not available. Dkt. 148-4 (Henegar Dep.) at 121:12-18.

60. Medical staff had several options to get Dilantin on short notice, including from the Standard Ward Inventory, and a local pharmacy. Dkt. 148-5 (McDade Dep.) at 28:19-29:12, 116:21-117:15; Dkt. 147-4 (Harrell Dep.) at 122:2-20.

### Mr. Henegar's First Seizure

61. During Mr. Henegar's first seizure, he actively convulsed for 20 minutes. Ex. B (Brewer Decl.) ¶¶8-10; Ex. H (Atkins Decl.) ¶¶8-9; Dkt. 147-5 (Keith Dep.) at 156:6-157:2, 158:16-25.

62. Mr. Henegar was shaking so violently that the entire bed was shaking. Ex. H (Atkins Decl.) ¶8. His eyes were rolled back in his head and he was foaming at the mouth. Ex. B (Brewer Decl.) ¶8; Ex. H (Atkins Decl.) ¶9; Dkt. 147-5 (Keith Dep.) at 156:6-157:2, 158:16-25. It was scary and disturbing to see. Ex. H (Atkins Decl.) ¶9; Ex. B (Brewer Decl.) ¶8.

63. Stroh called McDade when Mr. Henegar returned to the prison after his first seizure and told her that Mr. Henegar was out of Dilantin. Dkt. 147-15 (Stroh Dep.) at 185:18-25, 189:13-190:1.

64. McDade told Stroh that the medication was "on order." Dkt. 147-15 (Stroh Dep.) at 191:13-19.

### Mr. Henegar's Second Seizure

65. Keith does not recall Mr. Henegar's second seizure but does not dispute the incident report in which he contemporaneously recorded his observations. Dkt. 147-5 (Keith Dep.) at 199:14-200:16.

66. According to the contemporaneous incident report, Keith observed Mr. Henegar having what appeared to be a seizure. Ex. I (9/1/16 Incident Report) at 0002.

67. Stroh did not observe Mr. Henegar during his second seizure. Dkt. 147-15 (Stroh Dep.) at 209:21-25; 212:21-213:2; 233:2-11.

68. Stroh told McDade during their phone call that he had not seen Mr. Henegar. Dkt. 147-15 (Stroh Dep.) at 211:19-212:1.

69. Stroh relayed to McDade information provided to him by Keith. Dkt. 147-15 (Stroh Dep.) at 241:21-242:3.

70. The only thing Stroh told McDade was what Keith told him, which is also what Keith wrote in the incident report: that Mr. Henegar appeared to be having a seizure. Dkt. 147-15 (Stroh Dep.) at 235:5-8.

71. Stroh may also have told McDade that Mr. Henegar was not actively seizing. Dkt. 147-15 (Stroh Dep.) at 241:21-242:3.

72. Nurse Lee's contemporaneous progress note says Mr. Henegar was experiencing decreased levels of consciousness for 25 minutes after the second seizure. Dkt. 147-9 (Medical-Dental Progress Record).

73. It is common medical knowledge that post-seizure patients can experience oxygen deprivation, respiratory distress, and other life-

13

threatening conditions. Dkt. 147-8 (Lee Dep.) at 22:22-23:14; Ex. D (Report of Dr. Moore) at Henegar 014226.

74. A patient who has had two seizures within a six-hour time window potentially faces a higher risk of having a third seizure. Dkt. 147-8 (Lee Dep.) at 158:12-159:2.

75. It is standard practice in the corrections setting to call for an ambulance immediately after a patient has a seizure. Ex. D (Report of Dr. Moore) at Henegar 014226.

76. McDade did not have information about Mr. Henegar's vital signs. Dkt. 148-5 (McDade Dep.) at 298:8-12.

77. Given that she was receiving information from someone who could not see Mr. Henegar, who was not medically trained, and who was not able to check Mr. Henegar's vital signs and oxygen levels, McDade should have told Stroh to call an ambulance immediately. Ex. D (Report of Dr. Moore) at Henegar 014226.

78. It is standard practice in correctional medicine for an on-call medical provider to advise nonmedical staff to call an ambulance immediately for a patient who has just experienced a seizure when the on-call provider cannot personally observe a patient or get vital signs. Ex. D (Report of Dr. Moore) at Henegar 014226.

79. Mr. Henegar got no medical care until Lee arrived at his bunk at 5:05 a.m. Ex. I (9/1/16 Incident Report) at 0002; Dkt. 147-15 (Stroh Dep.) at 218:8-15.

80. Lee said that Mr. Henegar was experiencing respiratory distress. Dkt. 147-15 (Stroh Dep.) at 237:13-238:10.

81. Lee talked to the paramedics and told them that Mr. Henegar's blood oxygen level had been 81% when Lee arrived at Walker. Dkt. 147-15 (Stroh Dep.) at 223:17-22; Ex. J (Ambulance Run Sheet) at Henegar 014002.

## Mr. Henegar's Damages

82. The four-day lack of Dilantin caused Mr. Henegar's seizures. Ex. K (Report of Dr. Spitz) at Henegar 14530.

83. The seizures were preventable: had he gotten his prescribed Dilantin between August 28 and August 31, 2016, he would not have had these seizures. Ex. K (Report of Dr. Spitz) at Henegar 14532.

84. Had Walker security officers told nursing staff at Walker that Mr. Henegar's medication was missing, his seizures could have been prevented. Ex. D (Report of Dr. Moore) at Henegar 014225.

85. Had Defendants Lee, Harrell, and McDade reviewed Mr. Henegar's MAR, checked the Binder, or inventoried the pill cart at any point

15

between August 29 and August 31, 2016, Mr. Henegar's seizures could have been prevented. Ex. D (Report of Dr. Moore) at Henegar 014225.

86. A seizure more than five minutes is called a status epilepticus. Dkt. 148-7 (Spitz Dep.) at 28:3-30:12; Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 014534.

87. Status epilepticus can cause microscopic damage to the hippocampus, which can impair an individual's short-term memory and ability to regulate his emotions, and make it more difficult for him to control his seizures with medication. Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 14534, 14536-37.

88. Mr. Henegar's August and September 2016 seizures caused his memory loss and anger issues. Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 14536.

89. Mr. Henegar had not experienced any problems with his memory or emotional regulation before his 2016 seizures. Dkt. 148-4 (Henegar Dep.) at 177:12-14; Ex. M (Dr. Mendoza Consultation Note) at 208; Ex. H (Atkins Decl. ¶17; Ex. E (Grievance Response) at 0052.

90. Mr. Henegar went from being a good friend to other detainees who lived in his dorm to being "Negative Dave"—negative, withdrawn from

social interactions, and embarrassed of his inability to remember people. Ex. B (Brewer Decl.) ¶15; Dkt. 148-4 (Henegar Dep.) at 103:1-13.

91. After the seizures, Mr. Henegar looked at his friends like he did not remember them anymore. Ex. B (Brewer Decl.) ¶15.

92. Mr. Henegar cannot perform some jobs without written instructions because he "wouldn't remember from day to day what it was [he] was supposed to be doing." Dkt. 148-4 (Henegar Dep.) at 27:22-28:3.

93. Mr. Henegar now struggles with grocery shopping, remembering to pay his bills, and remembering to go to appointments. Dkt. 148-4 (Henegar Dep.) at 88:16-21, 182:18-183:21.

94. Mr. Henegar now relies on a journal to keep track of daily events, and to remind himself of things he has to do, conversations he's had, and recent events or occurrences. Dkt. 148-4 (Henegar Dep.) at 88:8-21, 95:24-96:10, 182:18-183:21.

95. After his release from the Georgia Department of Corrections, he moved in with his mother, whom he relies on to remind him about doctor appointments. Dkt. 148-4 (Henegar Dep.) at 9:3-15.

96. Mr. Henegar cannot shop for a weeks' worth of groceries. Dkt. 148-4 (Henegar Dep.) at 139:25-140:13.

97. Since his seizures, Mr. Henegar forgets to pay bills. Dkt. 148-4 (Henegar Dep.) at 88:8-21.

98. Mr. Henegar said that between January and February 2020, he has had "at least six people come up and call me by name, ask me how I'm doing, and other questions, and I don't know who they are." Dkt. 148-4 (Henegar Dep.) at 103:2-13.

99. Before his 2016 seizures, Mr. Henegar's seizure disorder was well-controlled with seizure medicine. He'd had no seizures between when he started medicine and the 2016 seizures. Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 14536.

100. Mr. Henegar's seizure disorder is no longer well-controlled with medication. Even though he has taken medication consistently, he still has seizures. This problem will affect him for the rest of his life. Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 14536-37.

101. Had Mr. Henegar not experienced status epilepticus in 2016, his seizure condition would have remained well-controlled and well-controllable. Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 14536.

102. Harrell testified that she saw a photocopy of the post-it in the nursing office around the time this lawsuit was filed. Dkt. 147-4 (Harrell Dep.) at 223:1-224:24. Harrell testified that the only reason she can think of

for having seen the post-it and the MAR photocopy is if Defendant McDade was showing it to them after the litigation began. *Id.* 225:4-24.