### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | | |
|---|---|---|
| **DAVID HENEGAR,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION** |
| | § | **FILE NO. 4:18-cv-00192-HLM** |
| **v.** | § | |
| | § | |
| **GEORGIA CORRECTIONAL** | § | |
| **HEALTH, LLC, ET. AL,** | § | |
| | § | |
| **Defendants.** | § | |

## DEFENDANT MCDADE'S RESPONSES TO PLAINTIFF'S STATEMENT OF ADDITONAL MATERIAL FACTS

COMES NOW DEFENDANT CINDY MCDADE, and herein responds to Plaintiff's Statement of Additional Material Facts as follows:

### David Henegar

1.     David Henegar is a trained welder and mechanic, and a certified diesel and pipe-weld x-ray technician. Dkt. 148-4 (Henegar Dep.) at 20:1-6, 20:24-21:16, 24-21:16.

### RESPONSE

Respondent's fact is not material.

2.     He has been consistently employed in trade positions, including holding jobs as a welder, truck mechanic, and machinist. Ex. A (Resp. to Ds' ROG) ¶10; Dkt. 148-4 (Henegar Dep.) at 20:1-15, 24-21:11, 22:13-19, 26:23-27:7.

**RESPONSE**

Respondent's evidence does not support the Respondent's facts.  Plaintiff was incarcerated from May 10th, 2003 to May 23rd, 2017 and July 9th, 2009 through December 21st, 2011 and January 28th, 2014 through July 31st, 2018.  (Plaintiff's Dep., Exhibit 1.).

3.     Mr. Henegar was in the faith and character-based program at Walker, and to get in, Mr. Henegar needed to go a year without any disciplinaries. Dkt. 148-5 (McDade Dep.) at 11:14-12:4; 275:25-276:7.

**RESPONSE**

Respondent's fact is not material.

4.     While in the faith and character program at Walker State Prison, Mr. Henegar tried to be positive and keep everyone in good spirits. Ex. B (Brewer Decl.) ¶14.

**RESPONSE**

Respondent's fact is not material.

5.     He taught other people how to weld. Ex. B (Brewer Decl.) ¶14.

**RESPONSE**

Respondent's fact is not material.

**Policies Pertaining to Correctional
Officers' Provision of Medical Care at Walker**

6.     According to Georgia Department of Corrections policy, when correctional staff are notified that an inmate has an urgent or emergency health care need while medical staff are not at the facility, they must contact they must contact the on-call medical provider or 911. Ex. C (Urgent/Emergent Policy) at Mr. Henegar 3212, 3215.

**RESPONSE**

Disputed as misstating the cited evidence.  In fact, the cited SOP provides correctional staff with discretion to decide the appropriate course of action:

> Correctional Personnel will have the authority to decide the most appropriate choice of action in response to a medical emergency including:
> a. Direct call to "911" services in the event of a life-threatening emergency. (e.g., cardiac arrest, uncontrolled bleeding.)
> b. Direct call to Medical Personnel in the event of a serious medical problem. (Chest pain, difficulty breathing, seizures, unconsciousness.)
> c.     Notification     of     their     supervisor     about inmate/probationers with medical emergencies or serious medical problems after they have contacted the medical staff.

(Doc. 155-6 at 3212).

7.     McDade trained Stroh and Keith to report issues with inmates' medication using the MAR and verbally to medical staff, or an on-call provider if no medical staff were available in the facility. Dkt. 148-5 (McDade Dep) at 35:3-36:19; 37:17-22, 88:1-9; Dkt. 147-4 (Harrell Dep.) at 176:13-168:3; Dkt. 148-3 (McDade Decl.) ¶9.

## RESPONSE

Respondent's evidence does not support the respondent's facts.  McDade did not train Stroh and Keith to report issues with inmates' medication using the MAR. (McDade Dep., 210:21-211:25).

8.     Stroh and Keith knew that they could call the on-call doctor or nurse if there was a medical problem or a discrepancy between what was in an inmate's MAR and the medication that was available, or send an email. Dkt. 147-15 (Stroh Dep.) at 101:19-25; Dkt. 147-5 (Keith Dep.) at 125:18-126:14, 126:23-128:6, 131:24-132:2.

## RESPONSE

Admitted.

9.     Security officers should communicate directly with medical staff if a medical situation arises. They should not merely record an extremely serious medical issue, such as a lack of medication, in a MAR, without further action. Ex. D (Report of Dr. Moore) at Henegar 014224.

**RESPONSE**

Defendants object to this statement and to Dr. Moore's report as support therefor and immaterial and likely to confuse or mislead.  Fed.R.Evid. 402.  What security officers "should" or "should not" do is a reasonableness issue, something that might belong in a tort action but not one brought under the Eighth Amendment. Hoffer v. Sec., Fla. Dep. of Corr., 973 F.3d 1263, 1271 (11th Cir. 2020).

10.     It is common knowledge among correctional officers who provide medication to detainees that they must notify nursing staff directly about an issue with inmates' medications rather than just reporting it in the medication records. Ex. D (Report of Dr. Moore) at Henegar 014224.

**RESPONSE**

Respondent's fact is not material.   The common knowledge among correctional officers is not relevant to the determination of deliberate indifference. McDade also objects to this statement and to Dr. Moore's report as support therefor

5

and immaterial and likely to confuse or mislead.  Fed.R.Evid. 402.  The applicable legal standard is actual, subjective knowledge, not "common knowledge" among the people Dr. Moore has dealt with during her career.  McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).

11.     It was not reasonable for Stroh and Keith not to contact a nurse directly about Mr. Henegar's medication being out. Ex. D (Report of Dr. Moore) at Henegar 014226.

## RESPONSE

Respondent's evidence does not support the respondent's fact.  When Plaintiff reported to pill call and his medication was not on the pill cart, Keith told Plaintiff to go to the medical unit in the morning and let them know that he was out of medication.  (Stroh Dep., 154:4-22; Keith Dep., 145:25-146:14).  In addition, what is reasonable is a conclusion.  Further, McDade objects to this statement and to Dr. Moore's report as support therefor and immaterial and likely to confuse or mislead. Fed.R.Evid. 402.  This is a medical malpractice/negligence standard and it should not be allowed to be imported into this case:  "deliberate indifference is *not* a constitutionalized version of common-law negligence."  Hoffer, 973 F.3d at 1271.

6

12.     Stroh had never heard of the standard ward inventory or cabinet with extra medication. Dkt. 147-15 (Stroh Dep.) at 166:19-167:6.

**RESPONSE**

Respondent's fact is not material.

13.     Keith did not know what medication was in the standard ward inventory. Dkt. 147-5 (Keith Dep.) at 139:14-16.

**RESPONSE**

Respondent's fact is not material.

### Policies Pertaining to Nurses' Provision of Medical Care

14.     It was Defendant McDade's responsibility as supervisor to enact policies and train her subordinates, the other Medical Defendants, to ensure inmates received their medication. Dkt. 148-5 (McDade Dep.) at 176:6-9, 203:4-18.

**RESPONSE**

Respondent's evidence does not support respondent's fact.  McDade testified that she trained, guided, and managed the nurses that she supervised but she did not micromanage her nurses.  The nurses McDade supervised were licensed nurses and McDade expected the nurses to do their jobs.  (McDade Dep., 176:6-9; 203:17-

204:5).  To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.

15.    McDade knew that certain duties needed to be guaranteed, including having someone oversee medication, and check the pill cart to be sure medications were there. Dkt. 148-5 (McDade Dep.) at 101:17-102:18.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  McDade testified that she knew that having a nurse oversee medication and check the pill cart was necessary and a nurse was assigned to those duties.  (McDade Dep., 101:17-102:18). To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.

16.    McDade knew it was necessary to have some policies, and that it would be necessary to assign work to nurses to guarantee tasks were being completed; Dkt. 148-5 (McDade Dep.) at 100:14-101:16

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  McDade testified that she knew that having a nurse oversee medication and check the pill cart was necessary and a nurse was assigned to those duties.  (McDade Dep., 101:17-

102:18).  To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.

17.    McDade knew that the lack of a policy in which someone would check to be sure inmates had received certain medications could lead to serious health risks. Dkt. 148-5 (McDade Dep.) at 204:6-207:7.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact and misstates the cited evidence.  The correctional officers were trained to notify medical personnel if there was any discrepancies or issues during pill call or in the distribution of medication and McDade expected officers or the inmate himself to notify her of those issues.  (McDade Dep., 210:21-211:25).  To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.

18.    McDade did not have a policy that someone from medical would check the MAR every day. Dkt. 148-5 (McDade Dep.) at 203:14-204:2.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  The correctional officers were trained to notify medical personnel if there was any

discrepancies or issues during pill call or in the distribution of medication and McDade expected officers or the inmate himself to notify her of those issues. (McDade Dep., 210:21-211:25).  To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.

19.    McDade did not enact a policy to check the MAR more than once a week because she assumed that if an issue came up in the interim, somebody would let nursing know. Dkt. 148-5 (McDade Dep.) at 102:19-103:15.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.   The correctional officers were trained to notify medical personnel if there was any discrepancies or issues during pill call or in the distribution of medication and McDade expected officers or the inmate himself to notify her of those issues. (McDade Dep., 210:21-211:25).  To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.

20.     McDade had the authority to enact a policy in which someone from medical checked the MAR daily, but she chose not to because she did not want to micromanage. Dkt. 148-5 (McDade Dep.) at 203:14-22.

**RESPONSE**

Respondent's evidence does not support respondent's fact.  McDade testified that she trained, guided, and managed the nurses that she supervised but she did not micromanage her nurses.  The nurses McDade supervised were licensed nurses and McDade expected the nurses to do their jobs.  (McDade Dep., 176:6-9; 203:17-204:5).  To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.

21.     It defies common correction medicine practice to fail to implement policies that required medical staff to review the MARs and medication orders, and to inventory the pill cart more than once per week when medication is distributed without medical staff onsite. Ex. D (Report of Dr. Moore) at Henegar 14224-25.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  The correctional officers were trained to notify medical personnel if there was any discrepancies or issues during pill call or in the distribution of medication and McDade expected officers or the inmate himself to notify her of those issues.

11

(McDade Dep., 210:21-211:25).  To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact. In addition, Respondent's fact is not material because common correction medicine practices are not material to a deliberate indifference determination.

22.    It is widely acknowledged in the correctional setting that there should be policies requiring medical staff to check on the status of inmates' medications, including MARs, medication orders, and inventories, more than once per week, especially when there are times when there are no nursing staff onsite. Ex. D (Report of Dr. Moore) at Henegar 14225.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.   The correctional officers were trained to notify medical personnel if there was any discrepancies or issues during pill call or in the distribution of medication and McDade expected officers or the inmate himself to notify her of those issues. (McDade Dep., 210:21-211:25).  To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.  In addition, Respondent's fact is not material because common

correction medicine practices are not material to a deliberate indifference determination

23.    The lack of round-the-clock nursing staff on-site makes it even more critical for nursing staff to check all nursing records regularly.  Ex. D (Report of Dr. Moore) at Henegar 014225.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.   The correctional officers were trained to notify medical personnel if there was any discrepancies or issues during pill call or in the distribution of medication and McDade expected officers or the inmate himself to notify her of those issues. (McDade Dep., 210:21-211:25).  To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.  In addition, Respondent's fact is not material because common correction medicine practices are not material to a deliberate indifference determination

24.     McDade observed that at times, some nurses took it upon themselves to complete certain tasks, but there were no set procedures or protocols to ensure they were completed. Dkt. 148-5 (McDade Dep.) at 182:7-14, 203:14-22, 215:4-15

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  McDade testified that she knew that having a nurse oversee medication and check the pill cart was necessary and a nurse was assigned to those duties.  (McDade Dep., 101:17-102:18).  To the extent that this fact suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.  In addition, the term "certain tasks" is inadmissibility vague.

25.     The only tasks McDade assigned after Melton went on medical leave were overseeing the pill cart and working with the prison's doctor. Dkt. 148-5 (McDade Dep.) at 100:8-23.

**RESPONSE**

Respondent's evidence does not support Respondent's fact.  After Nurse Melton went on medical leave, Nurse McDade assigned Nurse Harrell to oversee the pill cart and for Nurse Lee work more closely with Dr. Burke and to process the doctor's orders.  (McDade Dep., 100:8-13; 220:1-6).  To the extent that this fact

14

suggests that McDade knew there was a need to for additional training or policies, the evidence does not support such a fact.

26.    McDade acknowledges that a breakdown in communication between nursing, the pharmacy, and security caused Mr. Henegar's injuries. Ex. E (Grievance Response) at 055; Dkt. 148-5 (McDade Dep.) at 243:5-21

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.   McDade acknowledged a breakdown in communication.   Plaintiff's failure to receive his mediation for four days was caused by a breakdown in communications, not by anything that amounts to deliberate indifference.

27.    Under no circumstances is it appropriate for a prison nurse to simply ignore the situation or decline to take any steps to provide medication upon learning that an inmate's prescription was unavailable. Ex. D (Report of Dr. Moore) at Henegar 014224.

**RESPONSE**

Respondent's fact is not material because McDade was not informed that Plaintiff's prescription was unavailable.

15

28.   In August 2016, Nurse Connie Willingham was stationed down in a separate building on the Walker Prison campus, called the "RSAT unit." Dkt. 147-4 (Harrell Dep.) at 66:24-67:8.

**RESPONSE**

Respondent's fact is not material. McDade does note, however, that Willingham sometimes assisted in processing medications that had been delivered to the prison, and therefore, was sometimes working in the main building.  (Lee dep. (Doc. 147-8) at 27:1-3, 28:7-22, 29:4-14).

29.   Willingham was territorial and wanted to do only RSAT work. Dkt. 147-4 (Harrell Dep.) at 80:6-9.

**RESPONSE**

Respondent's fact is not material.

### Processing Medications and Stocking the Pill Cart

30.   After medications were ordered from the pharmacy, they were logged in a binder containing the prescription orders ("the Binder"). Dkt. 147-12 (Melton Dep.) at 105:1-25.

**RESPONSE**

Admitted.

31.     It was a nurse's responsibility to "process" medications, which means cross-checking medication that had been delivered with the orders that were logged in the Binder, and checking them off when they were received. Dkt. 148-5 (McDade Dep.) at 164:12-24; Dkt. 147-4 (Harrell Dep.) at 116:7-13.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  Nurse Harrell testified only about the medication's received from the pharmacy, not about the medications not received from the pharmacy.  (Harrell Dep., 116:4-13).

32.     McDade and Harrell "processed medications" while Melton was on medical leave, though Harrell did it most often. Dkt. 147-8 (Lee Dep.) at 57:17-25; Dkt. 147-4 (Harrell Dep.) at 87:18-88:10; Dkt. 148-5 (McDade Dep.) at 164:12-24, 279:11-17; Dkt. 147-12 (Melton Dep.) at 107:3-15.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  The four citations cited by Plaintiff do not support his contentions.  Nurse Lee testified that "I am not sure as far as official responsibilities, but I know that Ms. McDade and Ms. Harrell – I had seen them both do processing of meds in my employment there. And Nurse Willingham, like I said, was capable of it."  (Lee Dep., 57:17-25).  Nurse Lee continued to testify that "I said Ms. Harrell was filling in for Ms. Milton in that

responsibility, but that someone else of the other two mentioned could have done on it a certain day.  I am not sure."  (Id. at 58:10-13).  Nurse Harrell testified that "I know that processed a lot of medications.  I probably did it more than anyone else." (Harrell Dep., 87:20-22).  Nurse Harrell also testified that "It wasn't a shared responsibility.  It was – I – it was my – I did the medications.  However, on occasion when things got really busy, somebody else might step in to do the medications." (Id. at 87:25-88:4).  Nurse Milton did not testify that McDade was responsible for medication processing.  (Milton Dep., 107:3-15).  Likewise, McDade did not testify that she had responsibility for processing medication.  (McDade Dep., 64:12-24; 279:11-17).  There is no evidence that McDade processed medications during the four days he went without his medication.

33.    Someone from the nursing staff would notice if a medication was missing. Dkt. 147-4 (Harrell Dep.) at 169:8-170:8.

**RESPONSE**

Respondent's evidence does not support Respondent's fact.  Harrell testified that normally someone would notice missing medication before the weekend but if it occurred on the weekend that correctional officers could call Nurse McDade to take care of the problem.  (Harrell Dep., 169:8-170:12).

34.    A nurse checked the Binder more or less every day. Dkt. 147-4 (Harrell Dep.) at 124:13-24; Dkt. 148-5 (McDade Dep.) at 254:24-255:12.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  McDade did not testify about how often the binder was checked except for testifying that it was normally checked weekly.  (McDade Dep., 279:4-17).

35.    It would have been noticed by anyone looking at the Binder if a medication had been ordered but not received. Dkt. 148-5 (McDade Dep.) at 266:5-25; 279:11-17.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  McDade did not testify about how often the binder was checked except for testifying that it was normally checked weekly.  (McDade Dep., 279:4-17).   In addition, the cited evidence indicates only that the processing nurse would have noticed what medications had been received, not necessarily what had not been received.

36.    It was the job of the person taking over for Melton to follow up on prescription orders that had not been fulfilled by the pharmacy within 48 hours of order. Dkt. 147-12 (Melton Dep.) at 104:1-17.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact. Milton testified concerning only her procedure for processing prescription orders and not anyone else's. (Milton Dep., 104:1-17).

37.   After medications were received and processed, they were stocked on the pill cart. Dkt. 147-4 (Harrell Dep.) at 268:4-18.

**RESPONSE**

Admitted.

38.   Harrell stocked the pill cart in August 2016 after Nurse Melton went on sick leave. Dkt. 147-8 (Lee Dep.) at 177:17-25; Ex. F (Harrell Interrog. Resp.) ¶6; Dkt. 147-4 (Harrell Dep.) at 268:4-18.

**RESPONSE**

Admitted.

39.   While Nurse Melton was on medical leave, Harrell inventoried the pill cart once a week on Mondays or Wednesdays. Dkt. 148-5 (McDade Dep.) at 166:10-167:1; Dkt. 147-4 (Harrell Dep.) at 156:16-25.

**RESPONSE**

Admitted.

## Pill Call and Medication Administration Records

40.    The prison official conducting pill call had a code to record in the inmate's Medication Administration Record ("MAR") whether the inmate had received the medication.  Dkt. 147-5 (Keith Dep.) at 111:1-13; Dkt. 147-4 (Harrell Dep.) at 217:16-22; Ex. G (MARs).

**RESPONSE**

Admitted.

41.    As relevant here, prison officials recorded "A" for administered, "N" for no-show, "R" for refused, and "A/W" for accepted but wasted. Dkt. 147-5 (Keith Dep.) at 111:1-13; Dkt. 147-4 (Harrell Dep.) at 217:16-22; Ex. G (MARs).

**RESPONSE**

Admitted.

42.    A "question mark" is not a designated marking and it would be unusual for one to appear in a MAR. Ex. G (MARs); Dkt. 147-4 (Harrell Dep.) at 208:2-6; 272:2-8.

**RESPONSE**

Admitted.

43.     If there were a question mark in a patient's MAR, someone should have looked into it. Dkt. 147-4 (Harrell Dep.) at 272:2-273:1; Dkt. 148-5 (McDade Dep.) at 265:9-15.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  Harrell and McDade both testified that if a question mark was noticed on the MAR, whoever noticed it would follow up on it.  (Harrell Dep., 272:2-273:1; McDade Dep., 265:9-15).  In addition, there is no evidence that Harrell or McDade saw Plaintiff's MAR during this subject time.

44.     Medical was responsible for checking the MAR for inmates who got 9:00 p.m. pills. Dkt. 147-12 (Melton Dep.) at 157:22-158:14.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  Milton testified it was not medical's responsibility to review the nighttime pill call MAR. (Milton Dep., 157:5-9).  Milton testified that medical was responsible for checking the MAR once a week or twice a week.  (Id. at 11-17).  Any other time, Milton relied on security to inform medical of any discrepancies with medications or problems with medication distribution.  (Id. 159:1-160:1).

22

45.     Someone from nursing should have checked the MAR every day. Dkt. 147-12 (Melton Dep.) at 157:10-17.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.   Milton testified it was not medical's responsibility to review the nighttime pill call MAR. (Milton Dep., 157:5-9).  Milton testified that medical was responsible for checking the MAR once a week or twice a week.  (Id. at 11-17).  Any other time, Milton relied on security to inform medical of any discrepancies with medications or problems with medication distribution.  (Id. 159:1-160:1).  In addition, what "should have" been done is not relevant to the determination of deliberate indifference.

46.     The nurse conducting the 5:00 a.m. pill call would see the MARs from the previous night's 9:00 p.m. pill call. Dkt. 147-12 (Melton Dep.) at 156:13-21.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.   Milton testified it was not medical's responsibility to review the nighttime pill call MAR. (Milton Dep., 157:5-9).  Milton testified that medical was responsible for checking the MAR once a week or twice a week.  (Id. at 11-17).

47.     Anyone conducting pill call would see a post-it that was on a patient's MAR. Dkt. 147-12 (Melton Dep.) at 160:11-161:2.

**RESPONSE**

Respondent's evidence does not support the Respondent's facts.   Milton testified that a post-it note would only be seen on a patient's MAR if someone was going through the MAR book.   (Milton Dep., 160:2-22).

48.     It was not common for post-it notes to appear on MARs, and a post-it signaled that something was wrong. Dkt. 147-12 (Melton Dep.) at 160:11-161:2.

**RESPONSE**

Respondent's evidence does not support the Respondent's facts.   Milton testified that a post-it note would only be seen on a patient's MAR if someone was going through the MAR book.   (Milton Dep., 160:2-22).

### Defendants' Failure to Provide Medication from August 28-August 31

49.     Melton logged Mr. Henegar's Dilantin order into the Binder when she sent the order to the pharmacy on August 23. Dkt. 147-12 (Melton Dep.) at 113:6-114:21; Dkt. 147-13 (Physician's Orders Form).

**RESPONSE**

Admitted.

50.     Between August 28 and August 31, there was a post-it note sticking out of Mr. Henegar's MAR like a flag. Dkt. 147-5 (Keith Dep.) at 131:3-11.

**RESPONSE**

Respondent's evidence does not support the Respondent's facts.   Keith testified that he may have remembered a post-it note saying that Plaintiff's medications were ordered but specifically did not testify that it was sticking out like a flag or sticking out in any other way.   (Keith Dep., 131:3-11).   In addition, Sgt. Keith was asked only about "toward the end of August of 2016" and not as to any specific dates or about the post-it note appearing on more than one date.

51.     Lee conducted the 5:00 a.m. and lunchtime pill calls between August 28 and August 31, 2016. Dkt. 147-8 (Lee Dep.) at 65:17-22.

**RESPONSE**

Admitted.

52.     Keith logged an unidentifiable marking that was not an "A" in Mr. Henegar's MAR on August 28, and a question mark in Mr. Henegar's MAR for August 31. Ex. G (MARs).

**RESPONSE**

Respondent's fact is not material as to McDade.

53.     On August 31, Stroh and Keith were at pill call and knew that Mr. Henegar had not received medication for at least three days. Ex. G (MARs); Dkt. 147-5 (Keith Dep.) at 147:12-23; Dkt. 147-15 (Stroh Dep.) at 153:19-22; Resp. to Ds' SOF ¶98.

**RESPONSE**

Respondent's fact is not material as to McDade.

54.     Keith and Stroh knew that failing to provide an inmate with prescription medication for four days could carry very serious medical risks. Dkt. 147-5 (Keith Dep.) at 140:19-141:10; 152:20-24; Dkt. 147-15 (Stroh Dep.) at 165:18-15.

**RESPONSE**

Respondent's fact is not material as to McDade.

55.     Lee knew it was important to provide seizure medication to Mr. Henegar. Dkt. 147-8 (Lee Dep.) at 233:20-234:9.

**RESPONSE**

Respondent's fact is not material as to McDade.

56.    Between August 28 and 31, 2016, Stroh took no steps to ensure that Henegar got his Dilantin. Dkt. 147-15 (Stroh Dep.) at 163:18-164:12.

**RESPONSE**

Respondent's evidence does not support the respondent's fact. When Plaintiff reported to pill call and his medication was not on the pill cart, Keith told Plaintiff to go to the medical unit in the morning and let them know that he was out of medication. (Stroh Dep., 154:4-22; Keith Dep., 145:25-146:14). In addition, what is reasonable is a conclusion.

57.    McDade worked weekdays from 8:00 a.m. until 4:30 p.m. Dkt. 148-5 (McDade Dep.) at 73:10-13.

**RESPONSE**

Admitted.

58.    The only nurse Keith ever overlapped with between August 28 and August 31, 2016, with was Lee on Monday, August 29 between approximately 5:00 a.m. when Lee arrived at Walker and 5:04 a.m. when Keith signed out of work. Dkt. 147-6 (Keith Time Records) at 0293; Dkt. 147-10 (Lee Time Records) at Henegar 13310-13311; Ds' SOF ¶27; Dkt. 148-5 (McDade Dep.) at 73:10-13.

**RESPONSE**

Respondent's fact is not material as to McDade.

59. Mr. Henegar told a nurse that his Dilantin was not available. Dkt. 148-4 (Henegar Dep.) at 121:12-18.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact. Plaintiff cannot remember the nurse he may have told this information, but he testified that it was a nurse conducting a daytime pill call. (Plaintiff's dep., 63:5-13). McDade was not told this information.

60. Medical staff had several options to get Dilantin on short notice, including from the Standard Ward Inventory, and a local pharmacy. Dkt. 148-5 (McDade Dep.) at 28:19-29:12, 116:21-117:15; Dkt. 147-4 (Harrell Dep.) at 122:2-20.

**RESPONSE**

Admitted.

**Mr. Henegar's First Seizure**

61. During Mr. Henegar's first seizure, he actively convulsed for 20 minutes. Ex. B (Brewer Decl.) ¶¶8-10; Ex. H (Atkins Decl.) ¶¶8-9; Dkt. 147-5 (Keith Dep.) at 156:6-157:2, 158:16-25.

**RESPONSE**

Respondent's fact is not material.

62.     Mr. Henegar was shaking so violently that the entire bed was shaking. Ex. H (Atkins Decl.) ¶8. His eyes were rolled back in his head and he was foaming at the mouth. Ex. B (Brewer Decl.) ¶8; Ex. H (Atkins Decl.) ¶9; Dkt. 147-5 (Keith Dep.) at 156:6-157:2, 158:16-25. It was scary and disturbing to see. Ex. H (Atkins Decl.) ¶9; Ex. B (Brewer Decl.) ¶8.

**RESPONSE**

Respondent's fact is not material as to McDade.

63.     Stroh called McDade when Mr. Henegar returned to the prison after his first seizure and told her that Mr. Henegar was out of Dilantin. Dkt. 147-15 (Stroh Dep.) at 185:18-25, 189:13-190:1.

**RESPONSE**

Admitted.

64.     McDade told Stroh that the medication was "on order." Dkt. 147-15 (Stroh Dep.) at 191:13-19.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  Even if McDade knew that Plaintiff's medication was "on order", it would not indicate to

her that Plaintiff had missed doses of his Dilantin medication.  The record clearly indicates that the medication for Walker inmates were ordered in advance of an inmate's prescription running out.  (McDade's Decl., ¶ 10).  Plaintiff's Dilantin medication was ordered on August 23rd, 2016.  (Milton Dep., 112:13-113:23; Exhibit 1).  Plaintiff did not miss his first dose of Dilantin medication until August 28th, 2016.  (Response to these SOF, ¶ 17).  Even if McDade knew that Plaintiff's medication was "on order", it does not indicate that she knew that Plaintiff had missed doses of his Dilantin medication.

## Mr. Henegar's Second Seizure

65.    Keith does not recall Mr. Henegar's second seizure but does not dispute the incident report in which he contemporaneously recorded his observations. Dkt. 147-5 (Keith Dep.) at 199:14-200:16.

**RESPONSE**

Respondent's fact is not material as to McDade.

66.    According to the contemporaneous incident report, Keith observed Mr. Henegar having what appeared to be a seizure. Ex. I (9/1/16 Incident Report) at 0002.

**RESPONSE**

Admitted

67.    Stroh did not observe Mr. Henegar during his second seizure. Dkt. 147-15 (Stroh Dep.) at 209:21-25; 212:21-213:2; 233:2-11.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  Officer Stroh testified that Plaintiff 1) was conscious, 2) that he asked Plaintiff if he was okay and Plaintiff said yes, 3) asked Plaintiff if he hurt himself or he hit anything during his seizure and Plaintiff said no, and 4) that he was examined and released from the hospital.  (Stroh Dep., 188:22-189:3; 213:4-214:18).  Later in the deposition Stroh testified that he could not actually remember whether he observed Plaintiff after his second seizure or if he relied on Sergeant Keith's description of Plaintiff after the second seizure.   (Stroh Dep., 233:12-235:18).   Whether Stroh interacted with Plaintiff after his second seizure or relied on information he received from Sergeant Keith about Plaintiff's condition is irrelevant.

68.    Stroh told McDade during their phone call that he had not seen Mr. Henegar. Dkt. 147-15 (Stroh Dep.) at 211:19-212:1.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  See Response to ¶ 67 above.

69.     Stroh relayed to McDade information provided to him by Keith. Dkt. 147-15 (Stroh Dep.) at 241:21-242:3.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  See Response to ¶ 67 above.

70.     The only thing Stroh told McDade was what Keith told him, which is also what Keith wrote in the incident report: that Mr. Henegar appeared to be having a seizure. Dkt. 147-15 (Stroh Dep.) at 235:5-8.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  See Response to ¶ 67 above.

71.     Stroh may also have told McDade that Mr. Henegar was not actively seizing. Dkt. 147-15 (Stroh Dep.) at 241:21-242:3.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  See Response to ¶ 67 above.

72.     Nurse Lee's contemporaneous progress note says Mr. Henegar was experiencing decreased levels of consciousness for 25 minutes after the second seizure. Dkt. 147-9 (Medical-Dental Progress Record).

**RESPONSE**

Admitted.

73.   It is common medical knowledge that post-seizure patients can experience oxygen deprivation, respiratory distress, and other life-threatening conditions. Dkt. 147-8 (Lee Dep.) at 22:22-23:14; Ex. D (Report of Dr. Moore) at Henegar 014226.

**RESPONSE**

Respondent's fact is not material.   Common medical knowledge is not relevant to the determination of deliberate indifference.

74.   A patient who has had two seizures within a six-hour time window potentially faces a higher risk of having a third seizure. Dkt. 147-8 (Lee Dep.) at 158:12-159:2.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  Lee testified that it depends on why a patient was having the first two seizures.  (Lee Dep. at 158:12-159:2). In addition, this statement is immaterial as there is no evidence nor any allegations of a third seizure.

75.     It is standard practice in the corrections setting to call for an ambulance immediately after a patient has a seizure. Ex. D (Report of Dr. Moore) at Henegar 014226.

**RESPONSE**

Respondent's fact is not material.  Plaintiff testified that he was not sent to the hospital via ambulance after every seizure he had while he was incarcerated. (Plaintiff Dep., 118:22-119:7).   In addition, what the standard practice in a corrections setting is not material to the determination of deliberate indifference. Additionally, Plaintiff has no evidence of any harm caused to him by any delay in calling 911.

76.     McDade did not have information about Mr. Henegar's vital signs. Dkt. 148-5 (McDade Dep.) at 298:8-12.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  See Response to ¶ 67 above.

77.     Given that she was receiving information from someone who could not see Mr. Henegar, who was not medically trained, and who was not able to check Mr. Henegar's vital signs and oxygen levels, McDade should have told Stroh to call an ambulance immediately. Ex. D (Report of Dr. Moore) at Henegar 014226.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  See Response to ¶ 67 above.  Additionally, Plaintiff has no evidence of any harm caused to him by any delay in calling 911.

78.    It is standard practice in correctional medicine for an on-call medical provider to advise nonmedical staff to call an ambulance immediately for a patient who has just experienced a seizure when the on-call provider cannot personally observe a patient or get vital signs. Ex. D (Report of Dr. Moore) at Henegar 014226.

**RESPONSE**

Respondent's fact is not material.  The standard practice in correctional medicine is not material to the determination of deliberate indifference.  In addition, McDade objects to this statement and to Dr. Moore's report as support therefor and immaterial and likely to confuse or mislead.  Fed.R.Evid. 402.  Further, Plaintiff has no evidence of any harm caused to him by any delay in calling 911.

79.    Mr. Henegar got no medical care until Lee arrived at his bunk at 5:05 a.m. Ex. I (9/1/16 Incident Report) at 0002; Dkt. 147-15 (Stroh Dep.) at 218:8-15.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.   Stroh interacted with Plaintiff, informed McDade's of Plaintiff's condition, and instructed Keith to wait with Plaintiff until Nurse Lee arrived.  (Stroh Dep., 213:2-215:17).

80.   Lee said that Mr. Henegar was experiencing respiratory distress. Dkt. 147-15 (Stroh Dep.) at 237:13-238:10.

**RESPONSE**

Respondent's fact is not material.

81.   Lee talked to the paramedics and told them that Mr. Henegar's blood oxygen level had been 81% when Lee arrived at Walker. Dkt. 147-15 (Stroh Dep.) at 223:17-22; Ex. J (Ambulance Run Sheet) at Henegar 014002.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  Nurse Lee determined that Plaintiff's oxygen level was 88% and that since she was the source of the information documented in the ambulance run report any indication that Plaintiff's oxygen level was 81% must be a typo.  (Lee Dep., 307:20-308:21).  In addition, this statement is immaterial to any issue presented in the pending motion for summary judgment as there is no evidence that either purported oxygen level—

whether 81% or 88%--had any impact on Plaintiff's outcome nor is damages an issue in this motion.

## **Mr. Henegar's Damages**

82.     The four-day lack of Dilantin caused Mr. Henegar's seizures. Ex. K (Report of Dr. Spitz) at Henegar 14530.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  Dr. Spitz's report indicates that the lack of Dilantin medication caused Plaintiff's seizure on August 31st, 2016 and was a contributing cause to his seizure on September 1st, 2016.

83.     The seizures were preventable: had he gotten his prescribed Dilantin between August 28 and August 31, 2016, he would not have had these seizures. Ex. K (Report of Dr. Spitz) at Henegar 14532.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  The report of Dr. Spitz does not state this fact.  In addition, Plaintiff was taken to a hospital after is first seizure where he received medical treatment and that Plaintiff currently has pending a separate lawsuit in which he claims that the medical personnel at the hospital are responsible for his injuries.  (Doc. 148-8).

84.     Had Walker security officers told nursing staff at Walker that Mr. Henegar's medication was missing, his seizures could have been prevented. Ex. D (Report of Dr. Moore) at Henegar 014225.

**RESPONSE**

Respondent's fact irrelevant and inadmissible as speculation.

85.     Had Defendants Lee, Harrell, and McDade reviewed Mr. Henegar's MAR, checked the Binder, or inventoried the pill cart at any point between August 29 and August 31, 2016, Mr. Henegar's seizures could have been prevented. Ex. D (Report of Dr. Moore) at Henegar 014225.

**RESPONSE**

Respondent's fact is inadmissible because it is speculation and a conclusion.

86.     A seizure more than five minutes is called a status epilepticus. Dkt. 148-7 (Spitz Dep.) at 28:3-30:12; Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 014534.

**RESPONSE**

Respondent's fact is not material.

87.     Status epilepticus can cause microscopic damage to the hippocampus, which can impair an individual's short-term memory and ability to regulate his

emotions, and make it more difficult for him to control his seizures with medication. Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 14534, 14536-37.

**RESPONSE**

Respondent's fact is not material.

88.    Mr. Henegar's August and September 2016 seizures caused his memory loss and anger issues. Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 14536.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  Plaintiff's expert, Dr. Spitz, was asked if he could give a percentage between the first seizure or the second seizure as a likely cause of Plaintiff's complaints.  (Spitz Dep., 38:15-39:2).  Dr. Spitz testified that "it would be much more likely that the first" seizure than the second seizure that caused Plaintiff's harm, "98%" more likely.  Id.  In addition, Dr. Spitz testified that these issues could be caused by other factors, including cancer treatment and the use of street drugs, both of which Plaintiff has experienced.  (Dr. Spitz dep., Pt. 2, at 40; Pl. dep. (Doc. 148-4) at 10, 13, 50-51). Also, immaterial to any issue presented in the pending motions for summary judgment.

89.     Mr. Henegar had not experienced any problems with his memory or emotional regulation before his 2016 seizures. Dkt. 148-4 (Henegar Dep.) at 177:12-14; Ex. M (Dr. Mendoza Consultation Note) at 208; Ex. H (Atkins Decl. ¶17; Ex. E (Grievance Response) at 0052.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  See response to ¶ 88 above.  In addition, this statement is immaterial to any issue presented in the pending motions for summary judgment.

90.     Mr. Henegar went from being a good friend to other detainees who lived in his dorm to being "Negative Dave"—negative, withdrawn from social interactions, and embarrassed of his inability to remember people. Ex. B (Brewer Decl.) ¶15; Dkt. 148-4 (Henegar Dep.) at 103:1-13.

**RESPONSE**

Respondent's fact is not material.

91.     After the seizures, Mr. Henegar looked at his friends like he did not remember them anymore. Ex. B (Brewer Decl.) ¶15.

**RESPONSE**

Respondent's fact is not material.  In addition, Dr. Spitz testified that these issues could be caused by other factors, including cancer treatment and the use of street drugs, both of which Plaintiff has experienced.  (Dr. Spitz dep., Pt. 2, at 40; Pl. dep. (Doc. 148-4) at 10, 13, 50-51).

92.    Mr. Henegar cannot perform some jobs without written instructions because he "wouldn't remember from day to day what it was [he] was supposed to be doing." Dkt. 148-4 (Henegar Dep.) at 27:22-28:3.

**RESPONSE**

Respondent's fact is not material.

93.    Mr. Henegar now struggles with grocery shopping, remembering to pay his bills, and remembering to go to appointments. Dkt. 148-4 (Henegar Dep.) at 88:16-21, 182:18-183:21.

**RESPONSE**

Respondent's fact is not material.

94.    Mr. Henegar now relies on a journal to keep track of daily events, and to remind himself of things he has to do, conversations he's had, and recent events or occurrences. Dkt. 148-4 (Henegar Dep.) at 88:8-21, 95:24-96:10, 182:18-183:21.

**RESPONSE**

Respondent's fact is not material.

95.     After his release from the Georgia Department of Corrections, he moved in with his mother, whom he relies on to remind him about doctor appointments. Dkt. 148-4 (Henegar Dep.) at 9:3-15.

**RESPONSE**

Respondent's fact is not material.

96.     Mr. Henegar cannot shop for a weeks' worth of groceries. Dkt. 148-4 (Henegar Dep.) at 139:25-140:13.

**RESPONSE**

Respondent's fact is not material.  McDade also notes that Keith testified that he had seen Plaintiff driving around Walker County five or six times since the subject seizures and that he passed Plaintiff in the Walmart while shopping.  (Keith Dep., 230:1-231:20).  Harrell treated Plaintiff after the subject seizures and did not complain of memory loss, dizziness, mood swings, or any similar complaints. (Harrell Dep., 259:21-260:13).  Stroh interacted with Plaintiff after the subject seizures and testified that Plaintiff did not seem to have any lingering effects from the experience.  (Stroh Dep., 266:3-24).

97.     Since his seizures, Mr. Henegar forgets to pay bills. Dkt. 148-4 (Henegar Dep.) at 88:8-21.

**RESPONSE**

Respondent's fact is not material.

98.     Mr. Henegar said that between January and February 2020, he has had "at least six people come up and call me by name, ask me how I'm doing, and other questions, and I don't know who they are." Dkt. 148-4 (Henegar Dep.) at 103:2-13.

**RESPONSE**

Respondent's fact is not material.

99.     Before his 2016 seizures, Mr. Henegar's seizure disorder was well-controlled with seizure medicine. He'd had no seizures between when he started medicine and the 2016 seizures. Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 14536.

**RESPONSE**

Respondent's evidence does not support the Respondent's fact.  The report of Dr. Spitz (Henegar 014532) provides that Plaintiff began antiseizure medication in 2015 and had a seizure in August of 2015.  In addition, Respondent's fact is not material.

100.  Mr. Henegar's seizure disorder is no longer well-controlled with medication. Even though he has taken medication consistently, he still has seizures.

This problem will affect him for the rest of his life. Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 14536-37.

**RESPONSE**

Respondent's fact is not material.

101.   Had Mr. Henegar not experienced status epilepticus in 2016, his seizure condition would have remained well-controlled and well-controllable. Ex. L (Rebuttal Report of Dr. Spitz) at Henegar 14536.

**RESPONSE**

Respondent's fact is not material.

102.   Harrell testified that she saw a photocopy of the post-it in the nursing office around the time this lawsuit was filed. Dkt. 147-4 (Harrell Dep.) at 223:1-224:24. Harrell testified that the only reason she can think of for having seen the post-it and the MAR photocopy is if Defendant McDade was showing it to them after the litigation began. *Id.* 225:4-24.

**RESPONSE**

Respondent's fact is not material.  Harrell testified that she saw only "a photocopy of a MAR with a blank area with something written in it as if it was -- it looked like it was a Post-it note" and could not recall when she saw it.  (Harrell dep.

44

(Doc. 147-4) at 223:1-225:21).  Harrell also testified that she did not know if it was

McDade who might have showed her a photograph of a MAR with a post it on it.

(Harrell Dep., 227:7-11).  Without more, this is immaterial.

This _____ day of January, 2021.

Respectfully submitted,

/s/ Paul Henefeld
Paul Henefeld, Esq.
Georgia Bar No. 346755
*Attorney for Defendant Cindy McDade*

9 Lenox Pointe, N.E., Suite B
Atlanta, Georgia 30324
404-841-1275
Fax 404-841-0248
pah@aps-law.com

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 14-point New Times Roman type face.

This ___ day of January, 2021.

Respectfully submitted,

/s/ Paul Henefeld
Paul Henefeld, Esq.
Georgia Bar No. 346755
*Attorney for Defendant Cindy McDade*

9 Lenox Pointe, N.E., Suite B
Atlanta, Georgia 30324
404-841-1275
Fax 404-841-0248
pah@aps-law.com

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | | |
|---|---|---|
| **DAVID HENEGAR,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION** |
| | § | **FILE NO. 4:18-cv-00192-HLM** |
| **v.** | § | |
| | § | |
| **GEORGIA CORRECTIONAL** | § | |
| **HEALTH, LLC, ET. AL,** | § | |
| | § | |
| **Defendants.** | § | |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for the opposing parties

with a copy of **Defendant McDade's Response to Plaintiff's Statement of**

**Additional Facts** by filing same with the Clerk of Court using the CM/ECF system

which will send notification of such filing to all counsel of record.

This _____ day of January, 2021.

Respectfully submitted,

/s/ Paul Henefeld
Paul Henefeld, Esq.
Georgia Bar No. 346755
*Attorney for Defendant Cindy McDade*

9 Lenox Pointe, N.E., Suite B
Atlanta, Georgia 30324
404-841-1275, Fax 404-841-0248
pah@aps-law.com