IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

DAVID HENEGAR                        :
                                     :
          Plaintiff,                 :
                                     :
v.                                   :        CIVIL ACTION NO.
                                     :        4:18-cv-192-AT
GEORGIA CORRECTIONAL                 :
HEALTH, LLC, *et al.*,               :
                                     :
          Defendants.                :

## <u>ORDER</u>

Plaintiff, David Henegar, a former inmate at Walker State Prison, brought this action for violations of his Eighth Amendment rights arising out of the alleged denial of medical care by the correctional and medical staff that caused him to suffer from permanent brain damage and an uncontrollable seizure disorder. Defendants' Motions for Summary Judgment [Docs. 147, 148] are currently before the Court.

## I.    Background

The following facts are undisputed for purposes of summary judgment.

Plaintiff David Henegar was an inmate at Walker State Prison from July 2014 to August 2017. Prior to the events of this lawsuit, Mr. Henegar was diagnosed with a seizure disorder. He was prescribed the antiseizure medication Dilantin to prevent seizures. In August 2016, the prison staff failed to give Mr.

Henegar his Dilantin over the course of four days from August 28th to August 31st. As a result, he suffered two seizures and alleged permanent injuries.

Defendants Lieutenant John Stroh and Sergeant Jerome Scott Keith worked as correctional officers at Walker State Prison at the time of Plaintiff's incident. Lt. Stroh was Sgt. Keith's supervisor and the two of them worked the same days and shifts and had the same days off.  Lt. Stroh was the shift supervisor on the nights of August 28 and August 31, 2016. Sgt. Keith worked the night shift on August 28 and August 31, 2016 from approximately 5:00 p.m. to 6:00 a.m. the next day. Neither Lt. Stroh nor Sgt. Keith worked the evenings of August 29 or August 30, 2016.

In August 2016, Defendants Cindy McDade, Sherri Lee, Mary Ann Melton, and Julie Harrell worked as nurses at Walker State Prison.  Nurse McDade is the nursing manager. Nurse Lee administered the daily 5:00 a.m. pill call.  On August 29, 30, and 31, 2016, Nurse Lee worked from approximately 5:00 a.m. until sometime after 2:00 p.m.  Nurse Melton worked at the prison up to and including August 24, 2016, and then, because of surgery, was out of work on medical leave until November 2016. In August 2016, Nurse Harrell worked from 9:30 a.m. to 6:00 p.m.

Walker State Prison does not have medical staff on site 24 hours a day or 7 days a week.  Instead, medical staff were present from approximately 5:00 a.m. to 6:30 p.m. on weekdays only.  Inmate medications that are not self-administered, including Dilantin, are delivered to inmates in individual doses through the pill call

process. Medication was distributed to inmates four times a day from the pill cart. In 2016, pill calls were conducted four times a day at approximately 5:00 a.m., 11:00 a.m., 4:00 p.m., and 9:00 p.m.  Nurses conducted the daytime pill calls on weekdays, Monday through Friday. The 9:00 p.m. (nighttime) pill calls and weekend/holiday pill calls were conducted by correctional staff, specifically, a lieutenant or a sergeant. The correctional staff relied on the medical staff to keep the pill cart's inventory up to date. The correctional staff had no authority to order medications.

The prison official responsible for conducting the evening pill call used certain codes to record in the inmate's medication Binder whether the inmate had received the medication.  As relevant here, prison officials recorded "A" for administered, "N" for no-show, "R" for refused, and "A/W" for accepted but wasted.  The medical staff was responsible for checking the Binder for inmates scheduled to receive medication at the 9:00 p.m. pill call.

At the time of the events giving rise to this lawsuit in August 2016, Mr. Henegar's Dilantin prescription was administered to him daily by prison correctional officers at a 9:00 p.m. pill call when no medical staff were on duty.

On August 23, 2016, Nurse Melton noticed Mr. Henegar's Dilantin would run out in three days and put in an order to refill the medication.  At 2:10 p.m., Nurse Melton faxed the prescription to the Georgia Department of Corrections pharmacy.  Nurse Melton logged Mr. Henegar's Dilantin order into the Binder when she sent the order to the pharmacy on August 23.  She expected that the

Dilantin would be delivered to the prison within two business days. Nurse Melton went on medical leave two days later on August 25, 2016, and did not return to work until November, 2016.[1] Plaintiff ran out of his Dilantin medication on August 28, 2016.

After medications were ordered from the pharmacy, they were logged in a binder containing the prescription orders ("the Binder"). A nurse checked the Binder more or less every day. It was a nurse's responsibility to "process" medications, which means cross-checking medication that had been delivered with the orders that were logged in the Binder and checking them off when they were received. After medications were received and processed, they were stocked on the pill cart. Nurse Harrell stocked the pill cart in August 2016 after Nurse Melton went on medical leave. While Nurse Melton was on medical leave, Nurse Harrell handled the inventorying of the pill cart and the ordering of medications. Nurse Harrell inventoried the pill cart once a week on Mondays or Wednesdays. Nurse McDade and Nurse Harrell both "processed medications" while Nurse Melton was on medical leave, though Nurse Harrell did it most often.

From August 28th, 2016 (Sunday) to August 31st, 2016 (Wednesday), Mr. Henegar went without his Dilantin medication. Mr. Henegar reported to pill call each day and asked for his medication but never received it. Mr. Henegar told a nurse at daytime pill call that his Dilantin was not available, though he does not know which nurse he spoke with or which day the conversation occurred. The only

---

[1] Plaintiff does not oppose summary judgment in favor of Nurse Melton. (*See* Pl.'s Resp. at 23.)

two nurses working daytime pill calls on the relevant days were Nurse Lee and Nurse Harrell.

On the evenings of August 28 and August 31, 2016, Lt. Stroh and Sgt. Keith conducted the 9:00pm pill call together. Neither Lt. Stroh nor Sgt. Keith were working the nights of August 29 or August 30. Sgt. Keith logged an unidentifiable marking that was not an "A" in Mr. Henegar's Binder on August 28, and a question mark in Mr. Henegar's Binder for August 31. A "question mark" is not a designated marking and it would be unusual for one to appear in the medication Binder. If there were a question mark in a patient's medication Binder, Nurse McDade and Nurse Harrell testified that someone should have looked into it. Between August 28 and August 31, there was a post-it note sticking out of Mr. Henegar's Binder like a flag. It was not common for post-it notes to appear on medication Binders, and a post-it signaled that something was wrong. Any one of the medical staff conducting the daytime pill calls would have seen such a post-it in the medication Binder.

On August 31, Lt. Stroh and Sgt. Keith were at pill call and knew at that point that Mr. Henegar had not received medication for at least three days.

At the August 31, 2016 pill call, either Lt. Stroh or Sgt. Keith told Mr. Henegar he should notify the medical staff in the morning about his missing medication. Both Sgt. Keith and Lt. Stroh knew that failing to provide an inmate with prescription medication for four days could carry very serious medical risks.

Lt. Stroh and Sgt. Keith thought that someone from the medical department would review the medication Binders every morning after the weeknight pill call. Lt. Stroh and Sgt. Keith thought that their responsibility was to note in the Binder whether inmates got their medications at the nighttime pill call and that the medical staff would handle matters from there. Sgt. Keith testified that it was his responsibility to notify the medical staff if there was a discrepancy with the inmate's medication.  Lt. Stroh and Sgt. Keith understood that it was their responsibility to communicate to the medical staff if a medication was not available. In addition to using the medication Binder, Lt. Stroh and Sgt. Keith also understood that they could verbally communicate with the medical staff about problems with an inmate's medication.

When Nurse Lee conducted the 5:00 a.m. pill call, she did not review the information in the medication Binders from the night or weekend before to see if any inmate had missed his medications.  According to Nurse Melton, this is something the 5:00 a.m. pill call nurse should do. When Nurse Lee arrived at the prison each morning and conducted the 5:00 a.m. pill call, it was not her regular practice to communicate with security and she did not get reports on the nighttime pill call.  After Mr. Henegar missed his first dose at the August 28 9:00 p.m. pill call, Sgt. Keith told the nurse who arrived for the August 29th morning shift.  The

nurse indicated the medication had been ordered. The prison staffing records indicate Nurse Lee worked the August 29th morning shift.[2]

After going without his medication for four days, Mr. Henegar had a seizure sometime around 10:50pm on August 31st, 2016. According to witnesses, he actively convulsed for 20 minutes, was shaking so violently that the entire bed was shaking, his eyes were rolled back in his head and he was foaming at the mouth. Sgt. Keith stayed with Mr. Henegar while Lt. Stroh went to his office to call the on-call doctor.  When the on-call doctor did not answer, Lt. Stroh called Nurse McDade, the nursing supervisor who told him to call 911. Mr. Henegar was transported to the hospital, was treated in the emergency room, and discharged back to Walker State Prison. He returned to his dorm at the around 2:30am on September 1st, 2016. About two hours later, at 4:30am, Mr. Henegar suffered a second seizure.

When Lt. Stroh and Sgt. Keith arrived at Mr. Henegar's dorm, the second seizure had subsided.  Lt. Stroh did not observe Mr. Henegar during or immediately after the second seizure.  Lt. Stroh called Nurse McDade and notified her of Mr. Henegar's second seizure based on information relayed to him by Sgt. Keith.  Lt. Stroh told Nurse McDade during their phone call that he had not seen Mr. Henegar and may also have told her that Mr. Henegar was not actively seizing.

---

[2] Nurse Lee never worked a pill call with Sgt. Keith. Nurse Lee and Sgt. Keith worked at the prison at the same time but did not distribute medication together. Their shifts overlapped for one hour of the day.

Nurse McDade advised Lt. Stroh that Nurse Lee would be arriving on duty soon and instructed Lt. Stroh to have Nurse Lee see Mr. Henegar upon her arrival.

On September 1, 2016, Nurse Lee arrived at work at 5:00 a.m. When she arrived, Nurse Lee was met by Lt. Stroh and Sgt. Keith who reported what had occurred overnight with Mr. Henegar and indicated that Nurse McDade had said that she should examine Mr. Henegar and determine whether he needed to be sent back to the hospital. Nurse Lee examined Mr. Henegar in his dorm and then had him taken by wheelchair to medical so that she could examine him more thoroughly. Nurse Lee determined that Mr. Henegar's oxygen level was 81%, which was low but not critical, and his pupils were functioning correctly, though they were slow to dilate in response to light. Nurse Lee took Mr. Henegar's vital signs and found "nothing of extreme concern," but thought that he needed supplemental oxygen and to be sent out to a hospital to make sure another seizure was prevented. Nurse Lee called the on-call doctor to get a physician's order for the oxygen and to discuss sending Mr. Henegar back to the hospital. Following her discussion with the doctor, Nurse Lee instructed Lt. Stroh to call 911. EMTs arrived and again took Mr. Henegar to a hospital.

Nurse Lee's contemporaneous progress note says Mr. Henegar was experiencing respiratory distress and decreased levels of consciousness for 25 minutes after the second seizure. A patient who has had two seizures within a six-hour time window potentially faces a higher risk of having a third seizure. It is standard practice in the corrections setting to call for an ambulance immediately

after a patient has a seizure.  Following the report of his seizure at 4:30 a.m., Mr. Henegar received no medical care until Nurse Lee arrived at his bunk at 5:05 a.m.

The nursing supervisor, Nurse McDade, claims that she had no knowledge that Mr. Henegar was not receiving his Dilantin medication during the four days he went without medication.   Lt. Stroh testified that he told Nurse McDade between Mr. Henegar's first and second seizures that Mr. Henegar's Dilantin supply was empty, and Nurse McDade told him that it was on order.   Nurse McDade did not treat Mr. Henegar during the four days he went without medication. Nurse McDade did not render any medical care to Mr. Henegar during the four days he went without medication. Nurse McDade did not see or speak with Mr. Henegar during the four days he went without medication. Mr. Henegar never requested any medical from care from Nurse McDade during the four days he went without medication. From August 28 to August 31, Mr. Henegar never told Nurse McDade that he was not receiving his medication.

On September 1st, 2016, after Plaintiff's second seizure, Nurse McDade looked into the incident, reviewed Mr. Henegar's chart and determined that his Dilantin medication was ordered and the order was sent to the pharmacy, but the pharmacy never sent the medication to the prison.  After the incident with David Henegar, the administration of all anti-seizure medications was changed from the 9:00pm pill call to the 4:00pm pill call which is distributed by a nurse to ensure that a nurse oversees the distribution of anti-seizure medications.

The prison medical department had a standard ward inventory, a cabinet containing many common medications. Dilantin was one of the medications available in the standard ward inventory. Lt. Stroh had never heard of the standard ward inventory or cabinet with extra medication.  Sgt. Keith did not know what medication was in the standard ward inventory.  Lt. Stroh and Sgt. Keith would not have access to the medication stored in the standard ward inventory.  Medical staff had several options to get Dilantin on short notice, including from the standard ward inventory, and a local pharmacy.

Before his 2016 seizures, Mr. Henegar's seizure disorder was well-controlled with seizure medicine. He'd had no seizures between when he started taking Dilantin and the 2016 seizures.  Mr. Henegar's seizure disorder is no longer well-controlled with medication. Even though he has taken medication consistently, he still has seizures. This problem will affect him for the rest of his life. A seizure lasting more than five minutes, like the one Mr. Henegar suffered on August 31, 2016, is called a status epilepticus.  Status epilepticus can cause microscopic damage to the hippocampus, which can impair an individual's short-term memory and ability to regulate his emotions, and make it more difficult for him to control his seizures with medication.  The two seizures Mr. Henegar suffered on August 31 and September 1, 2016 caused memory loss and emotional regulation issues that Mr. Henegar had not previously experienced.  After his release from the Georgia Department of Corrections, he moved in with his mother, whom he relies on to remind him about doctor appointments. Mr. Henegar cannot perform some jobs

without written instructions because he "wouldn't remember from day to day what it was [he] was supposed to be doing."  Mr. Henegar now struggles with grocery shopping, remembering to pay his bills, and remembering to go to appointments. He now relies on a journal to keep track of daily events, and to remind himself of things he has to do, conversations he's had, and recent events or occurrences.

Nurse McDade acknowledges that a breakdown in communication between nursing, the pharmacy, and corrections staff caused Mr. Henegar's injuries.

## II.    Standard of Review

Defendants, as the movants on summary judgment, bear the initial responsibility of asserting the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"For issues ... on which the non-movant would bear the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim to discharge this initial responsibility." *Id.* (internal citations and quotations omitted). The movant may discharge his burden by: (1) "showing – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case," or (2) supporting his motion for summary judgment "with affirmative evidence

demonstrating that the non-moving party will be unable to prove its case at trial." *Id.* at 1115-16; *Celotex Corp.*, 477 U.S. at 324-25.

Once Defendants have carried their burden, Plaintiff is required to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324.  Plaintiff's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.   Discussion

Plaintiff filed a Complaint on August 27, 2018, which, as amended, asserts claims pursuant to 42 U.S.C. § 1983 for violations of the Eighth Amendment.[3] Defendants Harrell, Lee, Melton (the nurses) and Defendants Stroh and Keith (the correctional officers) joined together in their Motion for Summary Judgment. Defendant McDade, the nursing supervisor, has filed her own separate Motion for Summary Judgment.  All of the Defendants seek summary judgment in their favor on these claims, arguing that Plaintiff cannot prove violations of his Eighth Amendment rights under clearly established law.[4]  In other words, Defendants invoke the defense of qualified immunity.

---

[3] Plaintiff asserted other related claims, including state law claims, which were dismissed while this case was assigned to Judge Murphy. (*See* Doc. 68, Order on Motions to Dismiss.)

[4] Having been added as a Defendant months after the two-year statute of limitations had run, Defendant Harrell also asserts that Plaintiff's claim against her is barred by statute of limitations. Plaintiff has argued the statute of limitations should be tolled due to a mental incapacity.  For the reasons stated *infra*, the Court need not address the statute of limitations argument.

### A.    The Judicial Doctrine of Qualified Immunity

On a defendant's motion for summary judgment based on qualified immunity, the Court must "resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1313 (11th Cir. 2017) (quoting *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)). "With the facts so construed," the court reviews the evidence using "the plaintiff's best case," not because the court must determine what facts "the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law." *Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016); (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002)); *Stephens v. DeGiovanni*, 852 F.3d at 1314.

Qualified immunity protects government officials performing discretionary functions from liability if their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *E.g., Perez*, 809 F.3d at 1218; *Ferraro*, 284 F.3d at 1194.

A government official asserting a qualified immunity defense bears the initial burden of showing "he was acting within his discretionary authority." *Glasscox v. City of Argo*, 903 F.3d 1207 (11th Cir. 2018) (citation omitted).  After the official makes this showing – or where there is no dispute the official's conduct was discretionary – the burden shifts to the plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time

13

of the alleged violation." *Id.*; *Lee v. Ferraro*, 284 F.3d at 1194 (stating that the burden rests on the plaintiff to show that qualified immunity is not appropriate).

To be clearly established, the state of the law must give the defendant "fair warning" that his conduct was unlawful. *Perez*, 809 F.3d at 1222; *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). A right is clearly established where it would be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful, in light of the specific context of the case, not as a broad general proposition.'" *Glasscox*, 903 F.3d at 1217 (quoting *District of Columbia v. Wesby*, ––– U.S. –––, 138 S.Ct. 577, 589 (2018)) (internal quotation marks and citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Stephens*, 852 F.3d at 1316 (quoting *Hope*, 536 U.S. at 739).

In determining whether the reasonable defendant would know his conduct is unconstitutional, the Court must consider "the relevant case law at the time of the violation." *Stephens*, 852 F.3d at 1315. To be clearly established, a legal principle must be "settled law, meaning that it is not merely suggested, but rather is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Glasscox*, (quoting *Wesby*, 138 S.Ct. at 589-90) (internal quotation marks omitted). A plaintiff's constitutional right "is clearly established if a concrete factual context exists so as to make it obvious to a reasonable government actor that his actions violate federal law." *Stephens*, 852 F.3d at 1315 (quoting *Fils*

*v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011)). It is not required that the case law be "materially similar" to the defendant's conduct; but "where the law is stated in broad propositions, 'a very high degree of prior factual particularity may be necessary.'" *Id.*; *Fils*, 647 F.3d at 1291 (quoting *Hope*, 536 U.S. at 740-41). Plaintiff is not required to cite "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citing *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).

Courts in the Eleventh Circuit look "only to binding precedent — cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose — to determine whether the right in question was clearly established at the time of the violation." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). There are three ways for a Plaintiff to establish that a right was "clearly established" for qualified immunity purposes. First, a plaintiff can point to a "materially similar case that has already been decided." *Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019), *cert. denied*, 139 S. Ct. 2678 (2019). The case need not be "directly on point," but the "existing precedent must have placed the constitutional question beyond debate." *Id.* (alteration adopted). Additionally, because "judicial precedents are tied to particularized facts, minor variations between cases may prove critical." *Wade v. United States*, --- F.4th ----, 20-11962, 2021 WL 4234168, at *6 (11th Cir. Sept. 17, 2021) (cleaned up).

Second, a plaintiff can point to a "a broader, clearly established principle that should control the novel facts of the situation." *Echols*, 913 F.3d at 1324 (quotation omitted). But a broader principle "must establish with obvious clarity that in the light of pre-existing law the unlawfulness of the official's conduct is apparent." *Id.* (quotation omitted) (alteration adopted); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1330 (11th Cir. 2007) ("The more general the statement of law is that puts the official on notice, the more egregious the violation must be before we will find that the official is not entitled to qualified immunity.").

And third, a plaintiff can show that "the conduct involved in the case may so obviously violate the Constitution that prior case law is unnecessary." *Echols*, 913 F.3d at 1324 (quotation omitted) (alteration adopted). "This narrow category encompasses those situations where the official's conduct lies so obviously at the very core of what the relevant constitutional provision prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Id.* at 1325 (quotation omitted).

### B. Whether, at Summary Judgment, Defendants' Conduct Constitutes Actionable Medical Indifference in Violation of Plaintiff's Clearly Established Eighth Amendment Rights

Plaintiff claims that before the events at issue in this case, Mr. Henegar's seizure disorder had been perfectly controllable by taking his daily medication, and he was able to live a normal life despite this medical condition. That changed in August of 2016, when, according to Plaintiff, Defendants needlessly deprived Mr. Henegar of this medication for four consecutive days, all the while knowing of the

serious risks to his health. As to each Defendant, Plaintiff contends there is ample evidence that he or she knew Mr. Henegar was going day after day without his medication and that the ensuing seizures Mr. Henegar suffered were an easily foreseeable result of leaving him unmedicated.

As each Defendant must be judged individually on the basis of what he or she actually knew, The Court analyzes Plaintiff's claims against the specific Defendants based on the alleged offending conduct.

Defendants do not dispute that Mr. Henegar's seizure disorder was a "serious medical need" that "if left unattended, posed a substantial risk of harm." *See Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).  Nor do they dispute that the four-day deprivation of Dilantin caused Mr. Henegar's seizures. Rather, the only issue this Court must evaluate is whether, as to each Defendant, a jury could find he or she was deliberately indifferent under the circumstances. Defendants acknowledge that, for at least some of them, the evidence shows miscommunications or missed communications but that the record fails to establish conduct that remotely rises to the level of deliberate indifference. Moreover, Defendants assert they are each entitled to qualified immunity on Plaintiff's medical indifference claim because there is no clearly established case law indicting their actions constituted deliberate indifference to Plaintiff's medical needs.

In response, Plaintiff argues that this is not a case that can be resolved at summary judgment. Defendants acknowledge that they did not give Mr. Henegar

any seizure medicine during the four days leading up to his seizures, and also that he received no medical attention for over 30 minutes after his second seizure. Defendants argue only that they acted appropriately or lacked notice. Plaintiff asserts the Court should deny Defendants' motions because the evidence at summary judgment is sufficient for a jury to find each defendant was aware of a serious risk of harm to Mr. Henegar but failed to take reasonable steps to address it.

The Eighth Amendment forbids the "inflict[ion]" of "cruel and unusual punishments." U.S. Const. amend. VIII. And the Supreme Court has held that because the Cruel and Unusual Punishments Clause prohibits "the unnecessary and wanton infliction of pain," it also prohibits "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976) (quotation omitted); *Hoffer v. Sec'y, Florida Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020). "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."[5] *Estelle*, 429 U.S. at 103; *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989). Thus, the state has a constitutional obligation to provide "minimally adequate medical care" to those whom it has incarcerated. *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991);

---

[5] The Court rejects Defendants arguments that Plaintiff himself is to blame for the prison's failure to provide his prescription medication. *See* (Defs.' Br. Supp. Mot., Doc. 147-1 at 21) (arguing that record shows no deliberate indifference "especially when one also weighs Henegar's own failures to seek relief for himself even though he had three full days in which to seek out help in obtaining his medications"). People who are incarcerated are stripped of "virtually every means of self-protection" and have no "access to outside aid." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "A person is not required to request medical care to prevail on a claim of deliberate indifference to a serious medical need." *Youmans v. Gagnon*, 626 F.3d 557, 566 n. 12 (11th Cir. 2010).

*Mandel*, 888 F.2d at 788.  However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 103.

To establish deliberate indifference, Plaintiff must demonstrate the Defendant "(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence." *Hoffer*, 973 F.3d at 1270; *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1234 (11th Cir. 2010).  The Eleventh Circuit recently reiterated the "stringency" of the deliberate indifference standard:

> We think it worth reiterating at the outset the stringency of the deliberate-indifference standard—because, it seems to us, the district court lost track of it and impermissibly evaluated the Secretary's treatment plan against a negligence (or perhaps even more lenient) benchmark. It's an easy enough mistake to make: Confronted with an inmate who has a serious medical condition, a reviewing court hears from experts about measures that (in their view) would provide the most effective treatment. When the court then sees evidence that prison authorities aren't taking those measures—that perhaps they could be doing more, doing better—it concludes that liability must presumably follow.
>
> Intuitive as that line of thinking may be—especially for lawyers and judges educated and trained in the common-law tradition—it does not reflect the constitutional standard. As we recently reiterated, "deliberate indifference is not a constitutionalized version of common-law negligence." "To the contrary, we (echoing the Supreme Court) have been at pains to emphasize that 'the deliberate indifference standard ... is far more onerous than normal tort-based standards of conduct sounding in negligence,' and is in fact akin to 'subjective recklessness as used in the criminal law.'" With respect to prisoners' medical care, in particular, we have held that the Eighth Amendment doesn't require it to be "perfect, the best obtainable, or even very good." Rather, we have emphasized, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."

*Hoffer*, 973 F.3d at 1271 (quoting *Swain v. Junior*, 961 F.3d 1276, 1287-88 (11th Cir. 2020) and *Harris*, 941 F.2d at 1505, 1510).[6]

The notion that medical malpractice (*i.e.*, negligence by a nurse or physician) is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle*, 429 U.S. 97, 105–07; *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995); *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999), *amended*, 205 F.3d 1264 (11th Cir. 2000). "Medical intervention exists along a spectrum." *Hoffer*, 973 F.3d at 1272. At one end is ignoring medical needs entirely, which the Eleventh Circuit has rightly and repeatedly condemned: "'Choosing to deliberately disregard' an inmate's complaints of pain 'without any investigation or inquiry,'" constitutes deliberate indifference. *Id.* (quoting *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Harris*, 941 F.2d at 1507; *accord, e.g., Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("Although [the inmate] may have desired different modes of treatment, the care the jail provided did not amount to

---

[6] Circuit Judge Beverly Martin – dissenting from the Court's holding that that the Eighth Amendment's "minimally adequate care" requirement did not require State prison officials to prescribe expensive anti-viral drugs to inmates with chronic Hepatitis C virus – noted her concern that recent decisions of Eleventh Circuit "will undermine the rights of our incarcerated citizens to maintain their health and safety while they serve their sentences." *Hoffer*, 973 F.3d at 1280.

deliberate indifference.").  "The best response to a serious medical need is not required by federal law in these cases." *Gagnon*, 626 F.3d at 564.

"Deliberate indifference may result not only from failure to provide medical care at all, but also from excessive delay." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010). Questions of deliberate indifference to medical needs based on claims of delay "are complicated questions because the answer is tied to the combination of many facts; a change in even one fact from a precedent may be significant enough to make it debatable among objectively reasonable officers whether the precedent might not control in the circumstances later facing an officer." *Id.* at 1318. Judicial decisions addressing deliberate indifference to a serious medical need are very fact specific:

> At a high level of generality, certain aspects of the law have been established: lengthy delays are often inexcusable, *see Harris v. Coweta Cnty.*, 21 F.3d 388, 394 (11th Cir.1994) (stating delay of several weeks in treating painful and worsening hand condition was deliberate indifference); shorter delays may also constitute a constitutional violation if injuries are sufficiently serious, *see Bozeman*, 422 F.3d at 1273 (delaying medical treatment for fourteen minutes was deliberate indifference where the plaintiff was not breathing during that time); and the reason for the delay must weigh in the inquiry*, see id.* But specific cases of deliberate indifference are complicated: the threshold of deliberate indifference is connected to combinations of diverse interdependent factual elements.

*Gagnon*, 626 F.3d at 564 (finding that "it was not already clearly established as a matter of law in June 2007 that a four-hour delay for injuries of this kind violated" the plaintiff's right to constitutionally adequate medical care).

The question here is whether the conduct of the Defendant officers and nurses was so reckless — so conscience-shocking — that it violates the Constitution.

Plaintiff asserts that it was. According to Plaintiff, there is sufficient evidence for a reasonable jury to conclude that Lt. Stroh and Sgt. Keith were deliberately indifferent by knowingly failing for four days to ensure Mr. Henegar got his Dilantin. They "acknowledge that they knew Mr. Henegar was not getting his medication and therefore had a serious medical need but contend there can be no dispute that they acted reasonably to address this need merely by putting a question mark in Mr. Henegar's [medication Binder], without taking a single additional action to address the problem, such as sending an email or contacting the on-call nurse." (Pl.'s Resp. at 14-15.)  Plaintiff contends that a reasonable jury could find that making a question mark on the medication Binder was contrary to the officers' training or tantamount to doing nothing at all. Alternatively, Plaintiff contends that even if the jury believes that Lt. Stroh and Sgt. Keith were told to make the question mark (and/or if the jury credits Sgt. Keith's story that he told a nurse on the 29th), both knew by August 31 that Mr. Henegar had gone four days without medication, and therefore whatever they were doing to notify medical staff was not working. Plaintiff asserts that a jury could conclude that at some point they had to do more.

The Court notes that Plaintiff has taken a few liberties with his characterization of the evidence.   Lt. Stroh and Sgt. Keith were only on duty and

present at the prison on two of the four days at issue.  Therefore, it would not be reasonable for a jury to conclude that Lt. Stroh and Sgt. Keith knowingly failed to ensure Mr. Henegar received his medication for four days.  Lt. Stroh and Sgt. Keith were on duty and administered the 9:00 pm pill call on the evening of August 28, 2016, the first night that Plaintiff did not receive his Dilantin.  Plaintiff does not dispute that the officers made a note in Mr. Henegar's medication Binder and that Sgt. Keith testified that he informed the nurse who came on duty the morning of August 29, 2016 as his shift was ending.[7]  For the next two days, August 29th and August 30th, Lt. Stroh and Sgt. Keith were off duty and nothing in the record suggests they were aware during this time that Mr. Henegar was not receiving his medication.  Instead, when the officers learned that Mr. Henegar had not received his medication for several days during the officers' administration of the August 31st 9:00 pm pill call, either Lt. Stroh or Sgt. Keith told Mr. Henegar he should notify the medical staff in the morning about his missing medication.  Less than two hours later, Mr. Henegar suffered his first seizure.

Even if a jury found that Lt. Stroh and Sgt. Keith should have contacted the on-call nurse immediately upon discovering Mr. Henegar had missed his Dilantin for four days, as discussed *infra*, Plaintiff has not pointed to any authority that

---

[7] On the one hand, Plaintiff asserts that a jury is free to disbelieve Sgt. Keith because Nurse Lee, who was on duty the morning of August 29, testified she did not know Mr. Henegar was missing any doses of Dilantin.  On the other hand, Plaintiff asserts that a jury could believe Sgt.  Keith and conclude that Nurse Lee knew on August 29 that Mr. Henegar was out of medication but failed to attempt to procure the medication for him for three days.

clearly establishes that their failure to do so under the specific facts of this case constitutes deliberate indifference.

As for the nurse Defendants, Plaintiff also asserts that the evidence supports a jury finding that they each knew that Mr. Henegar was out of medication and did nothing to address it.

According to Plaintiff, and based on Nurse McDade's testimony, it would have been readily apparent to anyone looking at Mr. Henegar's medical file (1) that he had not received medication since August 27, and (2) that it was not because he was declining to take it or failed to show up at pill call (as would have been indicated by the markings "R," "A/W," or "N"). Because the question marks (and the post-it note) used by the officers to note the missing medication were not designated markings, this would have signaled to Nurse Lee who conducted daytime pill calls on August 29 and August 30 that something was wrong with Mr. Henegar's medication.  Alternatively, Plaintiff contends that if a jury believes Nurse Lee's testimony that she did not know about the missing medication, she would still face liability for deliberate indifference because she knew she was supposed to be checking the medication Binders, but did not, despite the risk to inmates of not receiving their prescribed medication.

Plaintiff asserts that a jury could infer that Nurse Harrell knew that Mr. Henegar's medication was missing but did nothing about it.  Nurse Harrell was responsible for processing medication and stocking the pill cart on the days in question.  It was also her practice to inventory the pill cart on Mondays or

Wednesdays.   As Mr. Henegar's medication was missing Monday through Thursday, a jury could infer Nurse Harrell knew that Mr. Henegar was not receiving his Dilantin and her failure to correct the situation amounts to deliberate indifference.

Additionally, Plaintiff asserts that a jury could conclude that Nurse McDade was aware of the problem with Mr. Henegar's missing medication. First, Lt. Stroh testified that when he spoke to Nurse McDade following Mr. Henegar's first seizure, Nurse McDade responded that Mr. Henegar's medication was on order. Plaintiff contends that construing the facts in his favor, Nurse McDade knew that Plaintiff's Dilantin prescription order had not arrived at the prison, and therefore she must have known he had missed doses.   Also, like Nurse Harrell, Nurse McDade sometimes processed medications and checked the medication Binder during the relevant dates. One or the other of them was responsible for checking it daily. Plaintiff contends that a jury has to decide whether one of them did it all four days, whether they each did it over the course of the four days, or whether one or both of them failed to check knowing of the risks to the patients by this failure. If the jury concludes that Nurse McDade checked or should have checked on some of those days, it could find both Nurse McDade and Nurse Harrell liable for their deliberate indifference to Plaintiff's serious medical need for his antiseizure medication.

Plaintiff also contends that a jury could conclude that Nurse McDade was separately liable as a supervisor for medical indifference.   There is an alternative

explanation, according to Plaintiff, for Mr. Henegar's missing medication that creates an inference of deliberate indifference: Nurse McDade failed to implement a policy requiring the prison nursing staff to check the inmate medication Binders or follow-up on the missing medication.  As the supervisor responsible for setting policies and ensuring patients received their medication, Nurse McDade's failure to supervise a nursing staff without assigning these tasks would constitute deliberate indifference.

Construing the evidence in Plaintiff's favor, however, does not support the inference that Nurse Lee and Nurse Harrell did not check the medication Binders or follow up on the missing medication because their supervisor, Nurse McDade, never required them to do so.  (*See* Pl.'s Resp. at 32.)  The evidence presented by the parties indicates: (1) nurses were responsible for processing medications by cross-checking medication that had been delivered with the orders that were logged in the Binder and checking them off when they were received; (2) after medications were received and processed, they were stocked on the pill cart; and (3) the practice of the nurses was to conduct an inventory of the pill cart at least once per week. Plaintiff does not dispute this evidence.  The reasonable inference to be drawn from this evidence is that there were policies and procedures in place to track the administration of inmate prescription medication, but that these policies and procedures were not followed in this case.

Finally, Plaintiff asserts that there is also sufficient evidence for a jury to find that Nurse McDade exhibited deliberate indifference toward Mr. Henegar by

advising Lt. Stroh to have Nurse Lee check on Mr. Henegar upon her arrival on duty rather than to call 911 as soon as McDade learned Mr. Henegar had suffered a second seizure.  Plaintiff acknowledges he must show that the delay in treatment was deliberately indifferent as opposed to grossly negligent.  *See Harris v. Coweta Cty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) ("The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay.").  According to Plaintiff, Lt. Stroh called Nurse McDade after it was reported he had suffered another seizure.  Lt. Stroh told Nurse McDade that he had not observed the seizure but was reporting the information conveyed to him by Sgt. Keith.  Lt. Stroh also testified that he may have told Nurse McDade that Mr. Henegar was not actively seizing, and that he gave her no additional information.  According to Plaintiff, the facts taken in Mr. Henegar's favor establish that Lt. Stroh did not provide any information to Nurse McDade about Mr. Henegar's appearance or vital signs. Nurse McDade knew seizures can have life-threatening consequences, and that Mr. Henegar was at risk for a third seizure. Despite such knowledge, and despite the standard practice in the corrections setting to call for an ambulance immediately after a patient has a seizure, Nurse McDade told Lt. Stroh not to call 911 but decided that Mr. Henegar should wait over 30 minutes until the first nurse arrived to receive any medical care.

In evaluating the defense of qualified immunity, the Court construes the facts in Mr. Henegar's favor at this stage and asks whether the law was clearly established as of August 2016 to put each Defendant on notice that failing to

provide Plaintiff his Dilantin as treatment for his seizure disorder for several days and subsequently delaying his need for post-seizure medical care was unconstitutional.

Plaintiff asserts that it clearly was.   But he relies on: (1) broadly stated general propositions that prison authorities' failure to treat prisoner's medical needs or provide access to medical care or needlessly delaying treatment violates the Eighth Amendment; (2) unpublished opinions from the Eleventh Circuit involving prison officials' intentional refusal to provide prescription medication to prisoners; (3) district court cases; and (4) decisions from other Circuits.

Plaintiff points to only two factually similar cases from the Eleventh Circuit. Both are unpublished and cannot serve as clearly established law for purposes of overcoming a defense based on qualified immunity.

In the first of these cases, *Sparks v. Ingle*, the plaintiff, an inmate at the Fulton County jail, suffered from a seizure disorder and was administered **no** medication for 45 days from March 30 until May 15. The Eleventh Circuit held that the plaintiff produced sufficient evidence to create a genuine dispute as to whether the jail administrator had subjective knowledge of a risk of serious harm to the plaintiff posed by the plaintiff's unmedicated epileptic condition but intentionally disregarded that risk by delaying the renewal of his anti-seizure prescriptions:

> There is evidence in the record that Whitley knew that Sparks had seizures without his medication because Sparks had two seizures in Whitley's presence as a result of the jail not administering his medication, and Whitley twice told another inmate that the sound he heard was Sparks having a seizure. Nevertheless, according to the

record, when Sparks asked Whitley "to see the doctor or inquire about his seizure medicine," "[e]very time" Whitley gave Sparks "the run-around," stating that (1) "[a]ll the deputies [were] busy and could not take him to the doctor;" (2) "the sheriff has not approved it yet;" or (3) "the county commission could not afford it." Additionally, Whitley never passed on Sparks's complaints to the sheriff, as required by the jail employee policy. And although Sparks made no complaints when he was finally able to see a doctor on May 15, the doctor renewed his anti-seizure medication and added a new one. Thus, taken in the light most favorable to Sparks, the facts in the summary judgment record indicate that Whitley violated a constitutional right by disregarding the risk to Sparks and displaying conduct beyond mere negligence.

*Sparks v. Ingle*, 724 F. App'x 692, 695 (Jan. 11, 2018) (citations omitted).[8]

The conduct of the defendant jail administrator in *Sparks* bears no resemblance to the conduct of Lt. Stroh and Sgt. Keith based on the summary judgment evidence presented in this case. Importantly, there is no evidence that Lt. Stroh and Sgt. Keith ever witnessed Mr. Henegar having a seizure prior to the incident at issue here. Unlike in *Sparks*, there is no evidence that Lt. Stroh or Sgt. Keith ignored Mr. Henegar's requests for medication, refused to obtain the medication in response to his requests, or failed to communicate with other prison officials regarding Mr. Henegar's requests for medication. The evidence in *Sparks* indicated the jail administrator's intentional refusal to obtain medication to treat the plaintiff's serious condition. Here, the evidence suggests that Lt. Stroh and Sgt.

---

[8] The Court further found that clearly established law existed to put the defendant jail administrator on notice that his actions **on this record** violated the plaintiff's constitutional rights. *Id.* ("The United States Supreme Court and this Court have both held that intentionally delaying medical treatment to a prisoner with a serious medical need demonstrates deliberate indifference.") (citing *Estelle*, 429 U.S. at 104-05; *Goebert*, 510 F.3d at 1329; *Brown*, 894 F.2d at 1538; *Thomas*, 847 F.2d at 772-73). Even if the *Sparks* decision were published, because the facts of *Sparks* are starkly different from the facts here, the Court's clearly established finding has no application to this case.

Keith failed to take all necessary steps to remedy a problem with Plaintiff's prescription missing from the evening pill cart.

In the second case, *Benson v. Gordon Cnty. Ga.*, the plaintiff, a pretrial detainee, complained of back pain when he was booked into the jail. Two days later, when he saw a physician at the jail clinic, the physician recognized that the plaintiff was suffering from a preexisting T11 vertebral compression fracture and prescribed Ibuprofen and Lortab for the back pain. The plaintiff argued that the jail nurse withheld his pain medications on several occasions because he was unable to leave his cell bunk and retrieve the medication at the cell door, that he did not receive his first prescribed dose of the pain medication Lortab until seven days after it was ordered, and that he received pain medication only twelve days during his thirty-three-day incarceration. The Eleventh Circuit found that the evidence could suggest that the jail nurse deliberately withheld the plaintiff's pain medication. *Benson v. Gordon Cnty. Ga.*, 479 F. App'x 315, 318-319 (11th Cir. July 9, 2012). Alternatively, the evidence could suggest that the jail nurse provided grossly inadequate care by failing to give him pain medication for days at a time or by merely coming to his cell and offering medication that Benson could not retrieve, thus violating the plaintiff's constitutional rights by being deliberately indifferent to his serious medical needs. *Id.* The Eleventh Circuit further concluded that clearly established law provided the defendant nurse fair warning that her conduct violated the Constitution:

> This is not a case where the plaintiff has challenged a delay in treatment of only a few hours. *See Youmans*, 626 F.3d at 564–65 (discussing case law distinguishing between short delays and lengthy delays in medical treatment). Instead, he has put forth evidence that he went without pain medication for days. Rutledge knew Benson was in pain and that a physician had prescribed medication for that pain. Yet by failing to provide his medication, she allowed Benson to "needlessly suffer" from his back pain. Therefore, Rutledge is not entitled to summary judgment on the § 1983 claim on the ground of qualified immunity.

*Id.* at 319.

Assuming Defendants' conduct here constituted deliberate indifference to a serious medical need in violation of Plaintiff's Eighth Amendment rights, Plaintiff has failed to point to any law applicable to the circumstances presented in this case that clearly established the alleged violation of Plaintiff's rights.

## IV.   Conclusion

If Mr. Henegar had been a hospital patient or a resident of a nursing facility, these failures by the Defendants would likely have amounted to gross medical negligence.  However, the standard for establishing medical malpractice is not sufficient to establish the deliberate indifference required to demonstrate a constitutional injury under the Eighth Amendment, which requires conduct akin to criminal recklessness. Here, the law was not clearly established that Defendants' failure to ensure that Mr. Henegar received his anti-seizure medication for four days in a row and their failure to provide medical treatment for Mr. Henegar within 30 minutes following his second seizure violated his constitutional rights. Consequently, the Court cannot find that Defendants' conduct arose to the onerous

standard required to establish deliberate indifference. The Court therefore must find that Defendants are entitled to qualified immunity and thus **GRANTS** the Defendants' Motions for Summary Judgment [Docs. 147, 148] on that basis.

While the controlling legal authority demands this conclusion, this finding does not diminish the reality that Defendants' careless actions and their systemic communication failures caused Mr. Henegar serious suffering and have forever, irreparably altered his life. That Dilantin was available on-site in the standard ward inventory, or otherwise obtainable through a local pharmacy, demonstrates that this grievous outcome was entirely preventable. This manifest tragedy is not lost on the Court. Nor should such tragedy be lost on the previously dismissed entity defendants that shoulder the critical responsibility for the safe medical care of inmates. Lest these defendants have forgotten, while engaged in the business of prison medicine, the essential command of the Hippocratic Oath is "first, do no harm."

The Clerk is **DIRECTED** to serve a copy of this order on the counsel of the previously dismissed defendants. The Clerk is **DIRECTED** to enter judgment in favor of Defendants and further **DIRECTED** to close the case.

**IT IS SO ORDERED** this 30th day of September, 2021.

**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**